THE PEOPLE, *ex rel.* Post and others, *vs.* THE MAYOR, &c, OF
BROOKLYN.

Legitimate taxation is limited to the imposing of burdens or charges, for a public
purpose, equally upon the persons or property within a district known and re-
cognized by law as possessing a local sovereignty for certain purposes; as a
state, county, city, town, village, &c.

This rule excludes from the operation of the taxing power all those cases in which
the expenses of laying out public squares, and of opening or widening streets,
or of other like improvements, are charged upon certain persons or property in
consequence of supposed benefits.

It is a fundamental principle, in our government and laws, that individuals are
protected in the enjoyment of their property, except so far as it may be taken
in one of two ways, viz. as a public tax, upon principles of just equality; or
for public use, with a just compensation, ascertained according to the provis-
ions of the constitution.   *Per* BARCULO, J.

As money is *property,* the collection of every tax or assessment is taking property,
in some mode; and, in order to be legal, must be referable to one of the two
modes above mentioned.   *Per* BARCULO, J.

An assessment laid by a municipal corporation for the purpose of meeting the
expenses of building a public sewer, which expenses are directed to be appor-
tioned, and an assessment thereof to be made among the owners or occupants
of the lands and premises benefited thereby, in proportion to the amount of
such benefit which each shall be deemed to acquire by such improvement, is
not within the scope of the legitimate and constitutional exercise of the *taxing
power,* and is illegal and void.

The compensation required by the constitution to be paid whenever private prop-
erty is taken for public use, does not consist of real or imaginary *benefits,* but
can only be made *in money.*

Public improvements in cities and villages can only be paid for by a regular tax,
or by voluntary contributions.

CERTIORARI to the mayor and common council of the city
of Brooklyn, to remove certain proceedings had and taken by
them in constructing a sewer in De Kalb avenue and Raymond-
street in Brooklyn, and in assessing the expense thereof, and in
confirming the assessment for the same.   The respondents, in
their return, set forth the various proceedings for the construc-
tion of the sewer and the assessment of the expenses, at length.

VOL. VI.          27

Among other things not·necessary to refer to, particularly, it appeared from the return that on the 6th of Sept. 1847, a resolution was adopted by the common council declaring that the district of assessment for the sewer in question should include all the property fronting on streets which from their then adopted grade would discharge their surface water into such sewer; and directing the street commissioner to cause the necessary maps and assessment lists to be prepared for the purpose of laying the assessment according to such resolution. On the 26th of June, 1848, the sewer having been completed, an ordinance was passed directing the assessors to apportion the expense thereof, under such directions as should be given by the street commissioner, and one of the city surveyors. And three of the city assessors were designated, to make an apportionment of the estimated expense of said improvement, and to make a just and equitable assessment thereof among the owners or occupants of all the lands and premises benefited thereby, in proportion to the amount of such benefit which each should be deemed to acquire by said improvement. On the 3d of August, 1848, the assessors made their return to the common council of their doings and their assessment lists and maps, with a certificate showing the amounts assessed and for what purposes. The common council thereupon caused a notice to be published, that the assessment list would be presented to the mayor and common council on the 4th of Sept. 1848, for confirmation. Previous to that time, various remonstrances against the proposed improvement were presented. Among these was one signed by the relators and others, stating that they were owners, in fee, of the principal portion of the lands lying north and east of Washington Park, embraced within the proposed district of assessment. That the grades of the streets running through the said lands, as established by the common council, were sufficient to convey all the waters that fell upon the said lands to the Wallabout Bay, as the said bay then existed. That if, as it was supposed, the government of the United States should hereafter vary the condition of the said bay, a sewer in Flushing avenue which would empty at the same point as the Raymond-street

sewer would become forthwith necessary, the waters falling up-on the lands of the remonstrants would then be conveyed by the grade of the streets to this sewer, and such lands would be assessed for its construction likewise. And they alledged that neither in the then condition of Wallabout Bay, nor in any fu-ture condition of the same, could the Raymond-street sewer be made necessary or convenient to their lands. But that in order to afford a plausible pretext for assessing the high lands of the remonstrants for the benefit of those to whom, from the location of their lands, the Raymond-street sewer was material and ne-cessary, it had been proposed to divert the water falling south of Myrtle avenue and east of Washington Park from its natural course to the bay, or to a sewer in Flushing avenue, and to con-vey it along the southerly sides of Myrtle and Park avenues many hundred feet to the Raymond-street sewer. And the re-monstrants insisted that the proposed sewer was entirely unne-cessary, and useless to them, and that their property ought not to be assessed for building the same. Some of the other remon-strances alledged that the commissioners had disregarded the ordinance of the common council directing them to assess the expense on the property in proportion as it was benefited by the sewer, and had proceeded to lay out a district to suit them-selves, and had assessed upon each lot the same amount, with-out regard to locality, or the benefit such lot might have received from the sewer; that a large district drained by the sewer had been entirely omitted in their assessment, and other lands from which the water ran over the surface directly to Wallabout Bay were assessed; and other errors and irregularities were pointed out. After these remonstrances were presented, the assessment committee made a report recommending certain alterations in the assessment, and a motion was made to confirm the assess-ment as amended in such report, but an amendment was offered and adopted that the subject be referred back to the assessors, to report at the next meeting of the board. On the 16th of Oc-tober, two certificates were presented to the board, by the asses-sors, on reading which, the assessment was confirmed by the common council. It appeared from the return that on the 12*th*

and 16th days of October, when the common council were considering the question of the confirmation of the assessment, A. Crist, Esq. appeared before the board and requested to be heard as counsel for some of the parties interested, and who were assessed for the improvement. But it appearing that Mr. Crist had been heard before the assessment committee having the matter in charge, who had made their report, the application was denied. The whole assessment amounted to over $33,000.

*A. Crist,* for the relators. The whole proceeding is in violation of the constitution of this state, and of the United States. The common council had no right to fix the district of assessment, and to designate the property to be assessed. This was the duty of the assessors. The district of assessment is erroneous, improper and unjust. Lands and premises not benefited by the sewer, are included within the district of assessment and assessed for the improvement. The principle upon which the assessment is made is erroneous. The lands and premises assessed are not assessed in proportion to the amount of benefit derived from the improvement. The parties remonstrating against, and appealing from the assessment, had a right to be heard upon such appeal, before the common council, and in opposition to the confirmation thereof. After the subject had been referred back to the assessors, the common council had no right to confirm the assessment, until after new notice had been given. The whole proceeding is illegal and irregular. But if the assessment is valid, various items of expense are improperly charged and included therein.

*J. Humphrey & W. Rockwell,* for the respondents. I. The writ should be quashed, without looking into the return. Because, (1.) It is not a proper remedy, on account of great public inconvenience. (*Ex parte Mayor of Albany,* 23 *Wend.* 277, 284. *People, &c.* v. *Mayor of New-York,* 2 *Hill,* 12, 13. *Matter of Mount Morris Square,* 2 *Id.* 14, 28. *People* v. *Supervisors of Allegany,* 15 *Wend.* 158. *People* v. *Supervisors*

*of Queens,* 1 *Hill,* 195.)   (2.) Because it was not granted on proper motion in open court.   (*Bradner* v. *Supervisors of Orange Co.,* 9 *Wend.* 433.   *Albany Water-Works* v. *Albany Mayor's Court,* 12 *Id.* 292.   *People* v. *Supervisors of Allegany,* 15 *Id.* 198.)   (3.) Because the writ does not show who are the complainants, or set forth the irregularity complained of. (*Ex parte Mayor of Albany,* 23 *Wend.* 277.)   II. Limits of the inquiry to be made by the court, if the return is looked into by them.   (1.) The *certiorari* properly brings up nothing but the *record* of some judicial act.   (*People* v. *Mayor, &c. of New-York,* 2 *Hill,* 11.)   (2.) The court can only look into the record to see whether the common council had *power* or *jurisdiction.* (*Birdsall* v. *Phillips,* 17 *Wend.* 464.   *See also* 20 *Id.* 103, 145, 148, 189.   *Ex parte Mayor of Albany,* 23 *Id.* 277.   *People* v. *Mayor of New-York,* 2 *Hill,* 10.   *Matter of Mount Morris Square,* 2 *Id.* 14; 6 *Wend.* 564.)   (3.) The evidence can not be considered by the court.   (*See above cases.*)   By the principles settled in the above cases, all the objections to the assessment urged by the relators are disposed of.   But if the court look into the whole case, the assessment is not erroneous in either of the particulars complained of.   The law directing the assessment to be made by assessors is not unconstitutional.   The assessment is an exercise of the taxing power, and not an appropriation of private property to a public use.   (*Livingston* v. *Mayor of New-York,* 8 *Wend.* 101.   *Owners, &c.* v. *Mayor of Albany,* 15 *Id.* 375.   *Striker* v. *Kelly,* 7 *Hill,* 23.)

*By the Court,* BARCULO, J.   The first objection made to the proceedings of the defendants is founded upon the 6th and 7th sections of article one of the new constitution ; which provide that private property shall not be taken, for public use, without just compensation ; and that such compensation *shall be ascertained by a jury,* or *by not less than three commissioners appointed by a court of record,* when such compensation is not made by the state.   It is contended that the assessment in question is an attempt to take private property for public use, within the meaning of the constitutional inhibition : and is void, be-

cause no compensation has been ascertained, as required by the 7th section. On the other hand, the defendants claim that the assessment is not the taking of private property contemplated by the constitution: but that it comes within the legitimate scope of the taxing powers conferred upon them by the legislature.

The decision of this great question involves a careful inquiry into the powers of the legislature over private property; and into the true distinction between that taking of individual property, which can be deemed a fair exercise of the sovereign right of taxation, and that which requires the constitutional compensation.

It is by no means easy to trace clearly the dividing line between the two kinds of taking of private property. It has been observed by a learned judge of a neighboring state, that "the distinction between constitutional taxation and the taking private property for public use, by legislative will, may not be definable with perfect precision." (9 *Dana,* 517.) In fact the two appear to be, in principle, somewhat blended. Both are exercises of the sovereign power over individual property. Both are requisitions for the public use. And in both cases the individual is presumed to receive, or does in fact receive, some equivalent for his contribution. Our courts, as will hereafter be perceived, have in some instances confounded the two together. Nevertheless under our constitution their practical operation is essentially different; and it therefore becomes necessary for us, as well as we can, to draw the true line of distinction.

Untrammeled by authorities, a safe and sound rule may be deduced from a few simple and well settled principles. In the first place it may be assumed, as a fundamental principle, in our government and laws, that individuals are protected in the enjoyment of their property, except so far as it may be taken in two ways; viz. as a *public tax, upon principles of just equality, or for public use, with a just compensation, ascertained according to the provisions of the constitution.* Secondly, as money is property, the collection of every tax or assessment is

The People *v.* The Mayor, &c. of Brooklyn.

taking *property* in some mode; and, to be legal, must be refer-able to one of the two modes above mentioned.

*Taxes* are defined to be "burdens or charges imposed upon persons or property to raise money for public purposes." The right to impose a tax is inherent in every government, as essen-tial to its existence. It operates on all the persons and property belonging to the state. It is not conferred upon the legislature by any specific clause of the constitution: it passes under the general designation of "legislative power." We are not, how-ever, to understand that the legislature is omnipotent on this subject. Its powers are limited and controlled by certain prin-ciples which lie at the very foundation of free government. Among these is the principle of *just equality*. If the tax is laid to raise a revenue for the expenses of the state, it should be laid equally upon all the property in the state, if it be a tax upon property: or, if it be a capitation tax, all persons of the taxable class in the state should be equally affected. This is the only sense in which a tax is public. The legislature has not the constitutional authority to exact from a single citizen, or a single town or county or city, the means of defraying the entire ex-penses of the state. For if this could be done, the constitutional prohibition would be evaded in all cases, and the legislature could take private property for public use, without compensa-tion, to any extent, under the vague and indefinite pretence of taxation.

In carrying out this principle we must bear in mind that the state is subdivided into numerous subordinate communities, as counties, towns, cities, villages; each of which is clothed with a local sovereignty and a *quasi* legislative authority to regulate its local affairs. The same general principles applicable to an independent state, in regard to taxation, are applicable to these subordinate bodies politic. To defray county expenses a tax must be laid upon the persons or property of the whole county: while in regard to the peculiar expenses of each town they are to be collected from the respective towns. Such has been the general course of legislation in this state: and as to the country

portion of it, it is believed that there have been but few, if any, departures from this rule.

The principle does not permit the selection of certain individuals in a town or other district to be charged with the expense of a particular public work or improvement, under the pretence that it is for their peculiar benefit. Thus when a new road is opened, or a new bridge built, it is done at the expense of the whole town, although some of the tax-payers live several miles distant and may have no occasion for such road or bridge, and although the chief benefit is derived by a few, who live in the vicinity of the improvement. The local authorities have not the power to lay the whole tax upon the individuals whom they deem chiefly benefited, because it would not be a *public tax*. The improvement is made not for the private benefit of a few persons, but because it is a *public* benefit; otherwise the authorities would not make it at all. And if it is a public benefit, it should be a public charge.

This question is discussed with great ability by Chief Justice Robertson, of the Kentucky court of appeals, in *The City of Lexington* v. *McQuillan's Heirs*, (9 *Dana*, 513,) and in *Sutton's Heirs* v. *The City of Louisville*, (5 *Id*. 28.) In the latter case he holds this language in reference to the limit of taxation. "A common burden should be sustained by common contributions, regulated by some fixed general rule, and apportioned according to some uniform ratio of equality. Thus if a capitation or personal tax be levied it must be imposed on all the free citizens equally and alike; or if an *ad valorem* or specific tax be laid on property, it must bear equally, according to value or kind, on all the property, or on each article, of the same kind, owned by every citizen." "But the assessment in this case may not properly be considered as of the nature of a public tax, because it was not a duty or contribution levied by a fixed rule, and because also, it was not common, but was restricted to the owners of one particular lot."

The true rule deducible from sound reasoning, as well as the authorities, is this: *Legitimate taxation is limited to the imposing of burdens or charges, for a public purpose, equally upon*

*the persons or property within a district known and recognized by law, as possessing a local sovereignty for certain purposes ; as a state, county, city, town, village, &c.*

This rule, it will be perceived, excludes from the operation of the taxing power all those cases in which the expenses of laying out public squares, of opening or widening streets, or of other like improvements, are charged upon certain persons or property in consequence of supposed benefits. If these cases can be sustained at all, they must stand upon some other than the taxing principle.

The decisions in the courts of this state upon this question, it is admitted, are somewhat conflicting ; and it may not be too much to say, that their apparent inconsistency, may, in part, be traced to a departure from sound principles, in allowing the real or supposed benefits arising from a public improvement to be deemed a just compensation for the taking of private property ; and to the constant struggle to sustain our city authorities in their practice of assessing the expense of improvements upon the contiguous lands ; a doctrine which in my judgment does not rest upon any solid legal foundation.

The leading case on this subject is, that of *Livingston* v. *The Mayor, &c. of New-York,* (8 *Wend.* 85,) in which the court of errors seem to have held that the benefit accruing to a person whose land is taken for a street, by the increased value of adjacent property belonging to him, may be set off against the loss or damage sustained by him, by the taking of his property, and if equal to the loss or damage, is a just compensation for the property so taken. The remarks of the chancellor on page 101 are cited by the defendants as an authority to show that the assessment in question was within the taxing power. The learned chancellor there says, "the owner of the property is entitled to a full compensation for the damage he sustains thereby ; but if the taking of his property for the public improvement is a benefit rather than an injury to him, he certainly has no equitable claim to damages. Besides, it is a well settled principle, that where any particular county, district or neighborhood, is exclusively benefited by a public improvement, the inhabitants of

VOL. VI.        28

that district may be taxed for the whole expenses of the improvement, and in proportion to the supposed benefit received by each." With due respect to this very able and learned jurist, I think he was hardly warranted in intimating that it was a well settled principle of taxation that the inhabitants of a *neighborhood* were taxed for the whole expenses of an improvement, and in *proportion to the supposed benefit received by each.* I am not aware of a single instance where a *neighborhood* as such, and without some other legalized local character, can by our laws be taxed for any purpose, and much less, that such tax can be laid in any case, according to the *supposed benefit received by each,* with the single exception of the case then under consideration and those of a similar character, viz. the cases of streets, sewers, &c. in cities. Even school districts, which in the divisions of the state most nearly resembling neighborhoods that are authorized to lay a tax for certain purposes—a most fruitful source of litigation—are *quasi* corporations, created by statute ; and are required to apportion the tax, not according to the "benefits," but " on all the taxable inhabitants within the district, according to the valuations of the taxable property," &c.  (1 *R. S.* 482, § 76.)

Nor can I subscribe to the reasoning of that opinion on the subject of a constitutional compensation. Although it may at first view sound paradoxical to say that a man is injured by an improvement which benefits his property, yet when we examine the practical effect of the system of compulsory improvements it will be not at all difficult to believe that the spirit of the constitution is frequently violated.

In the first place, the benefits are *forced* upon him without his consent, and against his will. He has perhaps a few acres of land which have been improved and adorned and beautified with great care and expense. Not dreaming of rail-roads or city lots, he designs to spend his days in the enjoyment of those rural pleasures and employments. Unexpectedly, the public direct the opening of a street or avenue through the center of his grounds ; and surveyors and commissioners and jurors make their appearance to calculate the quantity and value of the land

to be taken, and estimate by dollars and cents, the cost of a grove of ornamental trees or an orchard of choice fruit; and, after having footed up the account of loss and gain, they gravely inform the astounded owner that he is *benefited*; that he can sell his lawn for a rail-road depot, and his garden for building lots, so as to realize more than he could have obtained for the whole premises before. Thus, instead of receiving any compensation for the ruin wrought upon his cherished plans and prospects, he is assessed and required to contribute, under the name of benefits, towards the expense of the work.

This is, however, but a mild and moderate instance of the workings of this system. It is when the giant hand of improvement falls upon the poor laborer or artisan, whose humble tenement and little lot of ground constitute his all, and who has no means of paying the enormous assessments imposed upon him, that it strikes with deadliest force. To such, this system may well seem to be founded in injustice and usurpation, as it brings to them oppression and ruin.

Again; those who take the property, or their agents, are the persons who decide that the owner is benefited. This may not be universally so, but it is so frequently, and is most emphatically so, in the case before us. Here the common council designate the beneficiaries, and the assessors apportion the charges among them. Such proceedings are thus spoken of by a learned court: "The public ought not to decide for any citizen, how far, or whether at all, he will be peculiarly benefited by a public work or other thing for which his property is taken without his consent. If such an arbitrary and discretionary power can be exercised in such a case, the constitutional guaranty would be of little or no value; for it would be easy to suppose cases in which even a jury would decide that the construction of a road, or the opening or improving of a street, or canal, near or through the land of another, would incidentally benefit the owner, by its resulting facilities, or by a consequential enhancement of the estimated value of his property; when in his own opinion, or even in fact, considering the use he makes, or intends to make of it, such an improvement, with

such a locality, would be inconvenient to him, and injurious to his interests; and when, therefore, he would sooner pay to have it made elsewhere and farther from him, or to prevent the making of it anywhere. Besides, the supposed or actual augmentation of the vendible value of one's estate, is not only not advantageous to him, but may be positively disadvantageous and onerous, if he should be determined to keep and never sell it. And whether he will, or should keep and enjoy it himself, or sell it, no one but himself can know or have any right to decide for him." (5 *Dana*, 32.)

Moreover, the benefits thus set off as a compensation for lands are too vague, ideal and imaginary. They rest not in fact but in conjecture. The public take the *substance* and leave the owner the *shadow*. They take his land, and in lieu thereof gave him the *opinion* of three men, or of twelve men, that he is not injured, although despoiled. Can this be the compensation contemplated by the constitution? "A just compensation for property applied to public use, clearly implies, as we think, the value of the property in money." "Moreover, if the public can pay for private property taken for public use, by setting off, against its value the ideal value attached by a portion of the same public to prospective advantages, expected to arise to the owner from the use to be made to his property, then the amount of compensation or whether there shall be any at all, will in every case depend on no fixed principle or certain criterion, but will often depend on the sovereign will, or on popular prejudice, caprice or mere imagination." (*Jacob* v. *The City of Louisville*, 9 *Dana*, 114.)

"For property taken for public use, without the owner's consent, the constitution entitles him to be paid, in *money*, the actual value of the property, and the actual or supposed advantage to him, of the appropriation can not be set off against *that value*." (*Sutton's Heirs* v. *Louisville*, 5 *Dana*, 28.)

In each of these cases the precise point was decided in relation to opening streets in the city of Louisville, under a constitutional provision like ours. And in *Rice* v. *Turnpike Company*,

(7 *Dana*, 81,) the same decision was made in reference to lands taken for a turnpike road.

The uncertain character of these compulsory benefits is illustrated by the numerous sales of the property for long terms to pay them. In the case of *Striker* v. *Kelly*, cited by the defendants' counsel, nearly three acres of land in the twelfth ward of the city of New-York were sold for the term of *one thousand years*, to pay the assessment for the benefit accruing to the owner from opening the Ninth avenue. In the *Matter of Fourth avenue*, (3 *Wend.* 152,) a single owner, besides his land taken, was assessed nearly $20,000 for benefit, although the affidavits before the court showed that there was no *present* advantage, and that it would take a large portion of the estate to pay the assessment. And in the *Matter of Canal-street*, (11 *Wend.* 155,) the court say, " in this case it is assumed, and not contradicted, that many individuals will be ruined, if compelled to pay the assessments for which they are liable."

But admitting that these benefits could be accurately and justly measured, there is still a further objection, which seems to me to be unanswerable; and that is that it charges *upon a few persons the whole expense of a public improvement*. It will be admitted that a street should not be opened by the public authorities, to promote *private* interests. They should have nothing to do with the personal aggrandizement of a few. Their duty is to take care of the public welfare : leaving private interests to be wrought out by private enterprise. It is only when the opening of a street is required by the *public good,* that the authorities can be properly called upon to interfere. If then the improvement is required by the public—is a benefit to the public, as it must be before it can be properly made—upon what principle can it be said that the *public* should not pay the expense ? What reason is there for charging the whole cost upon twenty or thirty individuals who happen to be in most cases especially annoyed, if not injured, by the work ? Is it said that these last are benefited ? The answer is that *all* the other citizens are also benefited, and they should therefore also contribute. If there is a public benefit, surely those whose lands are taken,

The People *v.* The Mayor, &c. of Brooklyn.

and whose designs may have been thwarted by the improvement, ought not to be singled out as the only persons who are excluded from a participation in the incidental advantages resulting from a public work. And although it be conceded that, in most cases, those whose lands are taken receive greater benefits than the inhabitants at large, still, as these benefits are, to some degree at least, speculative and prospective, and may be estimated at an amount entirely ruinous to individuals, and as no injustice can be done by apportioning them upon the whole city, sound policy indicates the latter as the wiser and the better course.

It may be supposed, by some, that if such improvements were to be made by a general tax, it would impose too great a check upon their advancement. No apprehension need be entertained on this point. If it be true that certain individuals are so greatly benefited, they will be quite as apt to discover where their interests lie as the common council : and if their lands are to be so much enhanced in value, they will by their voluntary contributions enable the authorities to perform the work, at a very trifling expense to the city at large. But this system would undoubtedly restrain unnecessary and improper improvements : for the authorities would not venture upon them until they were required by the public exigencies or convenience, which would be a just and wholesome restraint.

The case of *Livingston* v. *The Mayor, &c. of New-York,* can hardly be deemed an adjudication in favor of the proposition contended for by the defendants' counsel, that this assessment is within the scope of the taxing power. It would rather seem to sustain the doctrine that it was a taking of private property as understood by the constitution, with a compensation resting in benefits. The chancellor does not place his opinion distinctly upon either ground, but intimates that both are tenable.

The next case is that of the *Owners, &c.* v. *The Mayor of Albany,* (15 *Wend.* 375,) in which the court held that the legislature had power to prescribe the *mode* of giving *notice* to the owners of property to be assessed for the expenses of opening a public square in the city of Albany. Chief Justice Savage, in

delivering the opinion, remarks, " it cannot be conceded that any constitutional question properly arises." This was however not necessary to the decision ; as there was a full compensation in benefits, according to the preceding case. The whole reasoning of Judge Savage assumes that it was not an ordinary exercise of the taxing power, but a case of private property being taken for a just compensation.

The only remaining case on this point, relied on by the defence, is that of *Striker* v. *Kelly*, (7 *Hill*, 9.) On page 24 of the opinion Justice Beardsley says, " this was local taxation for a local purpose, and falls within the legitimate exercise of the taxing power ;" citing the case of *Livingston* v. *The Mayor, &c. of New-York*, and a case in 3 *Paige*, 45, which does not seem to bear upon the question. The case of *Striker* v. *Kelly* was the case of an assessment to pay the expenses of opening an avenue, in which there was a "just compensation," within the decision in the 8th Wendell, and the question of *taxation* did not necessarily arise. In addition, it may be remarked that the decision was *reversed*, so that the case *decides* nothing. (2.*Denio,* 323.)

The contrary authorities are much more clear and explicit. *In the matter of the Mayor, &c. of New-York*, (11 *John.* 77,) this court held that the exception of churches from *taxation* by the act passed April 8, 1801, did not excuse them from paying an assessment for benefits accruing from the enlargement of Nassau-street, on the ground that such assessment could not properly be considered a *tax.* In *Bleecker* v. *Ballou*, (3 *Wend.* 263,) it was held that an assessment for pitching and paving a street is not a *tax*, " that being a sum imposed, as it is supposed, for some public object."

In *Sharp* v. *Speir*, (4 *Hill*, 76,) it was decided expressly that authority given to sell lands for a tax *of any description* did not authorize a sale to pay an *assessment for benefits.* In delivering the opinion of the court Justice Bronson says, " Our laws have made a plain distinction between *taxes,* which are burdens or charges imposed upon persons or property to raise money for public purposes, and *assessments* for city and village improve-

ments, which are not regarded as burdens, but as an equivalent or compensation for the enhanced value which the property of the person assessed has derived from the improvement."

If it were not otherwise manifest, these authorities establish the position that the *assessment* in question is not a *tax*, within the legal meaning of that term. If it be not a tax, then it must be an attempt to take private property, which requires a constitutional compensation. For there is no middle ground on which to stand. There is no other power either express or implied—whether wielded directly by the supreme sovereignty of the state, or by one of the minor sovereignties revolving within it—to take a single dollar of any man's property for any purpose whatever. No matter what pretence of "benefit" or "improvement" may be resorted to, to cloak the transaction, if the effect is to appropriate individual property, of any description, those who are the actors must plant themselves upon one of these two positions, for security and defence.

There is another doctrine running through the cases on this subject, which is inconsistent with the idea of taxation. It is laid down as recognized in a number of adjudications, that the assessment of expenses must *not exceed* the value of the benefit. (*Matter of Fourth avenue*, 3 *Wend.* 452. *Matter of Albany-street*, 11 *Id.* 149. *Matter of Canal-street, Id.* 154. *Matter of William and Anthony-streets*, 19 *Id.* 678. *Matter of Flat-bush avenue*, 1 *Barb. Sup. Court Rep.* 286.) Why is this principle so constantly kept in view by our courts? Was it ever heard that an assessor, when laying a tax, inquired into the probable benefits each individual would receive? Certainly not. Taxes are laid according to the *public wants*, and are not governed by individual benefits. No benefits need be *ascertained*. Every person is *presumed* to be benefited, by his interest in the general welfare, to any amount which the public exigencies may require him to be taxed. It is only with reference to the constitutional compensation that the benefits are to be *ascertained*. And the very fact that it is necessary to inquire into the value of benefit is of itself conclusive proof that such cases are not an exercise of the taxing power.

In the *Matter of Canal-street*, (11 *Wend.* 154,) Chief Justice Savage says, " The principle that private property shall not be taken for public use without just compensation, is found in the constitution and laws of this state, and has its foundation in those elementary principles of equity and justice, which lie at the root of the social compact. The corporation may see the extent of the benefit of any improvement before proceedings are commenced; but the extent of injury to be done to individuals can not be known to them until the coming in of the report of the commissioners; they may then be satisfied that the property which is to be benefited, will not be benefited to the extent of the assessment necessary to indemnify those whose property is taken from them. What are they to do? If they proceed, they deprive some persons of their property unjustly; if the report of the commissioners is correct, the amount awarded to the owners of property taken can not be reduced without injustice to them. If the assessment is confirmed and enforced, the owners of the adjacent property must pay beyond the enhanced value of their own property, *and all such excess is private property, taken for public use, without just compensation.*"

And in the *Canal Bank of Albany* v. *Mayor, &c. of Albany,* (9 *Wend.* 244,) Justice Nelson holds the following language : " It is somewhat remarkable that the law should have been so careful in securing the rights of the parties whose lands are taken for public purposes, and providing a full compensation therefor, and at the same time so utterly neglectful of the rights of those whose lands are assessed to pay such compensation. It is obvious *that the amount of private property appropriated to public purposes is just as great in one instance as the other.* The rights of one class of individuals are secured by the award of damages equal to the value of the lands taken ; those of the other, by the assessment upon their lands *not exceeding* the benefit."

It may not be improper here to advert, briefly, to the course of legislation on this subject, in this state. Prior to the year 1807, the damages and expenses of opening public streets in the city of New-York were paid by the corporation. In that

year an act was passed authorizing the common council to appoint five freeholders, to make an equitable assessment of the damages among the owners or occupants of all houses and lots intended to be benefited, in proportion, as nearly as might be, to the advantage which each should be deemed to acquire. This practice has continued, with some modifications, to the present time. In Albany there was no assessment for benefits until the act of 1828, except in the fifth ward. This power was not originally contained in the charter of the cities of Hudson and Schenectady ; but is contained in some form in the charters of all the more recently incorporated cities. In Rochester, and some other cities, the common council have a discretion to defray the expenses out of a common street fund, either in whole or in part, or by assessments upon the owners and occupants of lands benefited. (*Laws of* 1834, *p.* 321.) In regard to the assessment of damages for lands taken by rail-road companies, it appears that in the older charters the direction required the commissioners or jury to determine the damages sustained by the owner, without specifying any principles to guide them. However, many of the charters granted prior to 1836, authorized a vice chancellor to " direct the manner of ascertaining the damages." Such was the case with *The New-York and Harlem Rail-Road,* (*Laws of* 1831; *p.* 323,) and *The New-York and Erie Raid-Road,* (*Laws of* 1832, *p.* 406.) On the 3d of May, 1836, the act incorporating the " Attica and Buffalo Rail-Road Company" was passed, which served as a pattern for the numerous like incorporations of that prolific session, and which, in regard to the assessment of damages, has been substantially followed ever since. That charter provides that the appraisers shall " assess the value of the land taken, and the damages such owners may sustain by the taking of their lands, by injury to buildings, and in the construction of such road, *without any deduction on account of any real or supposed benefit or advantage,* which such owners of such lands may derive by the construction of such road." (*Laws of* 1836, *p.* 323.) On the 27th March, 1848, the legislature passed a general act in relation to the formation of rail-road companies, by which it is provided

that commissioners shall be appointed to "ascertain and certify the compensation proper to be made to the said owners and parties interested, for the land, real estate and property so to be taken, or injuriously affected as aforesaid, *without any deduction or allowance on account of any real or supposed benefit or advantage*, which such owners or parties interested may derive from the construction of such road, and may, in their discretion, assess a separate, reasonable sum in favor of such owners and parties interested, or of any person appointed by the court to appear as attorney for them, for costs, expenses and reasonable counsel fees." (*Laws of* 1848, *p.* 229.)   From these acts it appears that, so far as the doings of the legislature may be supposed to indicate the sovereign will, it is becoming adverse to the system of paying for property, taken for public use, by estimated benefit.

I am, by no means, disposed to call in question the sovereign right of eminent domain, But conceding it to its fullest extent, and conceding also the right of the legislature to invest cities and villages with the usual powers of making and enforcing police regulations; I am nevertheless constrained to declare, after a most careful and anxious examination of the principles upon which these powers depend, that in my judgment the authority sought to be conferred upon the corporation of Brooklyn, and brought into exercise in this case, is not within the constitutional range of legislation.

The propositions which are supposed to be fairly deducible from the foregoing reasoning and authorities are,

1. That the assessment in question is not within the scope of the legitimate and constitutional exercise of the *taxing power*.

2. That the compensation required by the constitution does not consist of real or imaginary benefits, but can only be made *in money*.

3. That improvements of this kind can only be paid for by a *regular tax*, or voluntary contributions.

4. That the assessment under consideration is, therefore, absolutely void, and must be set aside.

Although, under the former constitution, similar assessments appear to have been countenanced or sustained, on the ground

that the benefits were to be deemed a just compensation, I think the terms of the new constitution absolve us from the authority of those unsound adjudications. The language of that instrument seems to contemplate only the taking of property in its restricted sense, and excludes the idea of money being taken. Indeed, the framers seem to have understood it as applicable to the taking of lands only. (*Debates*, 810, *Argus ed.*) It provides that the "compensation shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record." Now, if the property taken consisted of land or chattels, it is easy to understand how a jury or commissioners could meet and view the property, and estimate the amount of money to be paid as a just compensation. But in this case the defendants propose to take thirty or forty thousand dollars *in money;* and it would seem very like perverting language, and trifling with the constitution, to appoint commissioners, or order a jury, to ascertain the compensation which is to repay such an illegal exaction. For all will agree that the only mode of satisfying a fixed sum is by repaying that amount in specie. If it be said that the jury or commissioners are to assess the benefits resulting from the construction of the sewer, the answer is that the defendants have no more right to repay the money exacted, in sewers, than they have to repay it in horses, or houses, or any other property.

I think, therefore, that we are permitted to rest this case upon the solid foundation of principle. And although our decision may, and probably will, produce temporary inconvenience, it can not but be infinitely less prejudicial than the consequences which must flow from a continuing violation of that most essential and conservative feature of the constitution, which was designed to establish and secure, against all encroachments, the sacredness of private property.

Proceedings set aside.