Ranney, J.
The complainant in this case places his right to a perpetual injunction against the collection of the assessment upon three distinct grounds : First. That the ordinance under which it was assessed was not passed by a number of legal councilmen equal to the majority of a legal council. Second. That the proceedings of the council, in making the assessment, were unauthorized by the charter of the city and amendments thereto, and were consequently illegal. Third. That the whole proceeding was in contravention of sec. 4, art. 8, of the constitution of 1802. We will examine each of those propositions, and the reasons assigned for each, in the order in which they are stated.
First. Was this ordinance passed by a majority of a legal council ? Prior to the amendment of the city charter in March, 1850, the city was divided into three wards, In each of which was to be elected, on the first Monday of March in each year, three councilmen “ actually residing therein,” and as many aldermen as wards, to be chosen from the city at large, no two of whom-could reside in any one ward. These twelve persons, with the mayor as presiding officer, constituted the city council, to whom the government of the city was committed. A majority of this council must concur to pass an ordinance; and by an amendment passed in 1841, the concurrence of eight at least was made necessary to levy the general taxes for city purposes. Whether that provision extended to an assessment of this character it is not now necessary to decide. The ordinance in question was passed on the 26th of March, 1850, and was voted for in all its stages by ten of the twelve members *111 elected on the 4th day of that month. But it is claimed that three of these members were ousted from their offices, having been thrown *out of the wards for which they were elected by the amendment of the city charter passed in March, 1850. Some controversy exists as to the time this act took effect; but we see no reason to doubt that it took effect at the date affixed to it, which was March 22. If it were otherwise, however, it would not alter our conclusions.
By the first two sections of this act, certain territory was annexed to the city, and the whole was divided into four wards by specific boundaries. The third section reads as follows :
“ The number of eounciimen for each ward hereafter to be elected at the annual charter election, shall be reduced to two, and the annual charter election of said city shall, after the present year,~be held on the first Monday of April.”
No provision whatever was made for holding any elections in the whole or any part of the city in the year 1850. On the contrary, by the positive terms of the act, the first election under the new division was to be held after that year. Now as the principal, if not the only object in dividing the city into wards was for election purposes, we feel no hesitation in postponing all such provisions of the law to the time when they could be called into requisition -for that purpose. We think this the obvious intention of the act, and we are sure this construction gives legitímate effect to every provision in it. This leaves the council elected March 4th, 1850, the legally constituted council of the city for that year; nor do we suppose that this alteration of the wards had any more effect upon them than an alteration of the legislative districts of the state, before the expiration of the terms of the sitting members, with a view to a future election, would have upon the latter. The object would be the same in both cases. This view of the matter disposes of the question; but if it were otherwise, we are still equally clear that, while they continue to act de facto in virtue of their election, their proceedings would be valid and binding. This principal has been expressly and repeatedly settled by the ^supreme court of this state, State v. Constable, 7 Ohio, 245 ; State v. Alling, 12 Ohio, 16; State, ex. rel. v. Jacobs, 17 Ohio, 143.
Second. Were the proceedings of the council in conformity to the charter and amendments? To a clear understanding of the matters arising under this question, it is necessary to recur to the *112 ninth section of the city charter, passed March, 1836. It reads thus : “The city council shall have power to levy a special tax, to defray the expense of grading, paving, or otherwise improving any road, street, alley, lane, etc., by a discriminating assessment upon the land and ground hounding and abutting upon such road, etc., or near thereto, in proportion to the benefit accruing therefrom to such ground or land; and the city council shall appoint a committee of three disinterested judicious freeholders of said city, to estimate the cost of any such projected improvement, and to assess the expense on the land and ground aforesaid ; and it shall be the duty of the city council to provide by ordinance for the correction and equalization of said assessment; and the city council shall give notice in one or more newspapers published in said city, for six consecutive weeks, of the improvement to be made, in order that any one damaged by reason of such improvement may file his claim in writing in the office of the city clerk, within ton days after the expiration of said six weeks’ notice ; and the said committee shall assess damages, if any, to such claimants, and shall add the same to the costs of the improvement, as a part of the expense thereof, to be assessed as aforesaid; and said committee, within twenty days after the time shall have expired for filing claims for damages (unless for good cause the council shall grant them further timo), shall make return to the office of the city clerk, setting forth the ultimate cost of such improvement, including the damages awarded by them to the claimants, together with the names of such claimants and the ground of claim, with the amount awarded them severally set opposite their respective names, and also a brief description of the lands and grounds upon which they shall have assessed the expense of the improvement, etc.; and the city council *if they order and direct the improvement to be made, shall direct the city clerk, whose duty it shall be to deliver therewith, etc., to the city collector, to be by him collected, etc.”
By subsequent laws, special taxes were to be certified to the auditor of the county, and collected as other taxes.
The first exception taken to the action of the council is that they should have appointed the committee of estimate and assessment, and have received their report before passing the ordinance for constructing the improvement; when in fact they were appointed at the same time and by one section of the ordinance itself. It is not contended that this is so expressly provided by the charter, but *113 from the nature of their duties, it is claimed that this report was designed for the information of the council before providing for the work.- The section is not free from ambiguity upon this point; but proceeding upon the same ground assumed by counsel for complainant, we are brought to the opposite conclusion. The improvement must first be “projected.” By whom and how projected? Evidently by the council, and we know of no more appropriate method for expressing their corporate assent than by ordinance. By the positive terms of the section, after this the committee must be appointed. Their first duty is to estimate the cost of the improvement and the amount to be paid claimants; and then to assess the whole upon the lands benefited. The ascertainment of the cost of damages is the indispensable predicate upon which the assessment of the tax is founded, and must of necessity precede it. The whole is then returned to the council, and is again under their entiro control. By the report of the committee, they are put into the possession of information approximating to reasonable certainty, as to the cost of the improvement. If they are unwilling to encounter it, they need go no further: if otherwise, they can then “order and direct” the proper officer to cause the improvement to be made ; and after thé assessment is corrected and equalized, cause the same to be returned to the auditor and placed upon the duplicate. This clause was substantially, nay, strictly pursued.
*It is next objected that no sufficient noticeof the improvement to'be made ” was given to claimants of damages, in pursuance of said ninth section. The notice actually given was the publication of the ordinance, with the word “ notice” prefixed. It is nowhere alleged or pretended that the complainant had any clqims for damages, or that he was in any way injured for the want of a proper notice. It is difficult to see how he can make this objection enure to his benefit, or how it can add anything to the equity of his bill. It will be in time to decide this question when those who have been injured complain.
Again, it is claimed that the assessment should have been upon all the land bounding on the whole street, whereas it appears that it was put only upon those abutting upon the part of the street improved, and “ near thereto.” Ye do not understand council as contending that a part of a street might not in this manner be improved without undertaking the whole, but they insist that the assessment must be upon the whole. "We think this construction, en *114 tirely inadmissible. The tax is upon land alone, and is imposed upon the principle of charging each particular tract with its just proportion, according to the benefit specially accruing to it from the improvement. The owner is not taxed because of its general convenience, but because his land is specially enhanced in value. Now this street may be a mile or more in length, and the lands upon it at the upper end, instead of being enhanced in value, may bo actually depreciated by the increased facilities for business on the part improved. It would be little less than absurd to hold that the legislature intended to compel these lands to be taxed, while those within two hundred feet of the improvement, upon streets intersecting it, were not to be, because lying on streets called by other names ; although it is manifest the owners of the latter would derive fourfold advantage from it over the former. We can not therefore say that the committee in the exercise of their discretion did not assess all the lands on the street benefited by the improvement; and as it is not pretended *but that they acted in good faith, no foundation is laid for controlling that discretion by this court. But wo think the charter has controlled their discretion, in a manner entirely consistent, however, with their-action, by requiring them to make the assessment upon lands abutting the improvement “or near thereto.” If the council have power under the general words “ any street,” etc., in the first clause of the section to improve a part of a street, as appears to be conceded, it seems to us clear that the words in the next clause, “ grounds bounding and abutting on such street,” confine the assessment to ground on the part of the street improved. If part only can be lawfully improved, that part only can be lawfully taxed; and this we are satisfied is the true meaning of the law.
. It is next insisted that the assessment was far too much, being for $10,662, when in fact the improvement was made under a contract entered into April 20th, 1850, for $10,000. It is not made to appear with sufficient clearness to base judicial action upon, that this sum covered the whole cost of the improvement; but if it did we should still be of opinion that the fact alone that the assessment exceeded the actual expenditure, unattended by any circumstance .of fraud or bad faith in the committee, would not invalidate the tax. 'The committee was appointed March 26th, 1850, and for aught that .appears entered upon the discharge of their duties. As before ¡stated, the first step to be taken by them was to estimate the cost, *115 etc., of the improvement; the next to assess the property. Now, all this might have been done before the council had made any contract for its construction, or had even determined in what manner the work should be done. At all events, no necessary connection, by law, exists between their duties and the actual construction of the work. All that is required of them is to “ estimate” in good faith the probable cost of the work, and upon this basis the tax is levied. This estimate in its very nature may, and almost unavoidably will, vary from the actual expense incurred. Nor does this view of the case in the least impair *tho authority of the eases of Jonas v. Cincinnati, 18 Ohio, 318, and Reed v. Toledo, Id. 161, relied upon by complainant’s counsel. In each of those cases a part of the assessment was made, as appeared by the ordinance, fox purposes not authorized by the charter, and this was very correctly held to render the tax illegal.
Some other considerations of minor importance are suggested by counsel; but without entering into an extended examination! of them, it will suffice to say, that we are all of opinion that they furnish no ground for the relief prayed for, and we are entirely satisfied that the requirements of the charter have been duly observed in making the assessment.
Third. The next question arising is, Was the charter itself consistent with the first constitution of this state, under which these proceedings were had? To show that it was not, two sections of that instrument are invoked. They áre as follows :
Art. 8, sec. 4. “ Private property ought and shall ever be held inviolate, but always subservient to the public welfare; provided a compensation in money be made to the owner.”
Art. 8, sec. 28. “ To guard against the transgression of the high powers which we have delegated, we declare that all powers not hereby delegated remain with the people.”
Each of these sections contains very important provisions which it is the right of every citizen to invoke, and the duty of the judicial tribunals to guard with scrupulous fidelity. The section last quoted guards against the exercise of powers not delegated by any department of the government. The powers delegated to separate departments are legislative, executive and judicial, without any attempt at specific enumeration.' Each of these departments can exercise such power, and such only, as falls within the scope of the express delegation. Hence, we have alreaded decided in the case *116 of the Cincinnati, Wilmington and Zanesville R. R. Co. v. The Commissioners of Clinton County, ante 79, that any act passed by the general assembly “ not falling fairly within the scope *of legislative power is as clearly void as though expressly prohibited.” Does "this section fall within that limit? It provides for making and improving the streets of a city—an undertaking of a strictly and emphatically public character. This state, in common with all the other states, has always exercised this power, and has authorized the counties, towns and cities to do the same within their respective limits; and it is now too late to question it as one of the undoubted powers of the legislative department. As indispensable means to attain this end, the right to take private property and to levy and collect taxes, must exist. Roads can not be built without land to locate them upon and money to pay for their construction. But neither of these rights can be exercised without the existence of a rightful, constitutional end to be accomplished, to which they may be referred. Without this, property can not be taken or taxes levied. And this brings us to the question, under which one of these two rights of the public does,the assessment in question fall, and to consider what limitations and restrictions were fixed upon the exercise of each by that constitution, when employed for legitimate ends. The right of eminent domain and the right of taxation, both alike involve the right to take private property, and in both compensation is made or is supposed to be made. In the first case it must be made in money by the positive requirements of the section first recited, and if this assessment falls under that division it can not be sustained. In the case of taxation, the taxpayer “ is supposed to receive his just compensation in the protection which government affords to his life, liberty and property, and in the increase of the valhe of his possessions by the use to which the government applies the money raised by the tax.” The People v. Mayor, etc., of Brooklyn, 4 Comst. 422.
But here the analogy ends, and in pointing out the distinction between the two, I can not do better than to adopt the language of Mr. Justice Buggies, in the case just referred to.
*“ Taxation exacts money or services from individuals, as and for their respective shares of contribution to any public burden.”
“ Private property taken for public use by right of eminent do *117 main is taken, not as the owner’s share of contribution to a public burden, but as so much beyond his share.
“ Special compensation is therefore to be made in the latter case, because the government is a debtor for the property so taken ; but not in the former, because the payment of taxes creates no obligation to repay, otherwise than in the proper application of the tax.
“ Taxation operates upon a community, or upon a class of persons in a community, and by some rule of apportionment.
“ The exercise of the right of eminent domain operates upon an individual, and without reference to the amount or value exacted from any other individual or class of individuals.”
If these distinctions are sound, and we believe them to be, it is not difficult to see that the section of the constitution referred to has no application to this case. The assessment upon the complainant belongs to the taxing power, and in the constitution then in force was subject to no express restriction, but that against poll taxes. It is not pretended that any land or other property was taken or attempted to be taken from the complainant for the construction of this improvement; but he was taxed, in common with a class of persons standing in the same situation, his share of contribution in proportion to the benefit received, for a public burden. We have already seen tjiat the city might be constitutionally authorized by the legislature to construct improvements of this character, and that it might resort to taxation to do it. Is there any constitutional objection to its being a special or discriminating tax upon the real estate more particularly benefited by the improvement? If there is any, it is not found in express terms in the instrument. This may be matter of regret. It is because experience has shown that the unlimited right- to tax, even for lawful ^purposes is often abused, that most important restrictions are put upon it in the constitution of this state now in force. But it is impossible for this court to fix limits .to the power, where the constitution has fixed none. Without this, as expressed by Chief Justice Marshall in Providence Bank v. Billings, 4 Pet. 514:
“ The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle, which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the government, as part of itself, and need not be reserved when property of any description, or the right to use it in any manner, is *118 granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burdens; and that portion must be determined by the legislature. This vital power may be abused, but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation.” And again, in McCulloch v. Maryland, 4 Wheat. 428, the following observations are found coming from the same high authority:
“It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the government acts upon its constituents; this is, in general, a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government aright of taxing themselves and their property; and as the exigencies of the government can not be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislature and the influence of the ^constituents over the representatives to guard them against its abuse.”
This unlimited power to tax necessarily involves the right to designate the property upon which it is to be levied—in other words, to apportion the tax. And except in cases where the proceeding is merely colorable, and it is really and substantially an exercise of the right of eminent domain, the judicial tribunals can not interfere with the legislative discretion, however erroneous it may be. This was expressly so decided in the case before cited from 4 Comstock, and has in effect been so held in this state in the cases of Cincinnati v. Gwynne, 10 Ohio, 192, and Bonsall and wife v. Lebanon, 19 Ohio, 418.
When the argument of the complainant’s counsel was prepared, much reliance was placed upon the case of The People v. Mayor, etc., of Brooklyn, 6 Barb. 209, in the supreme court of New York. It is unnecessary to notice this case further than to say that it is the same case referred to in 4 Comstock, where the decision of the *119 supreme court was reversed, and the conclusions of this case fully-sustained by the court of appeals.
We have also been referred to the cases of Sutton’s Heirs v. The City of Louisville, 5 Dana, 28; Jacob v. Louisville, 9 Dana, 114; and City of Lexington v. McQuillan’s Heirs, Id. 513, in the court of appeals of Kentucky. Without entering into an extended examination of these cases, we do not think they can be carried to the extent claimed for them; but if they could, they must be regarded as very much restricted by the subsequent decisions of that court, and especially by the case of Slack et al. v. Maysville and Lexington R. R. Co., decided in 1852.
On the whole, we are of opinion that the injunction should be dissolved, and the bill dismissed.

Bill dismissed.