The People, *ex rel.* Griffing and others, *vs.* The Mayor and Common Council of the City of Brooklyn.

The act of a municipal corporation, in confirming an assessment for grading an avenue, is an exercise of judicial authority; and the proceedings may therefore be removed into the supreme court, by the common law writ of certiorari, for review.

A municipal corporation has no authority to make an assessment of the expenses of grading a public street or avenue, upon and amongst the owners and occupants of the lands benefited by such improvement, in proportion to the amount of such benefits and the estimated expense. Morse, J. dissenting.

Accordingly, where the expenses of grading an avenue in the city of Brooklyn were apportioned, not upon all the lands in the city, but upon seventy-three lots of ground upon or immediately adjacent to the avenue, the property of seventeen different proprietors, and the assessments were to be collected from them in consideration of the benefits and advantages which such lands would derive from the improvement of the street; *Held* that the proceedings were illegal and void, and the assessment was vacated and set aside. Morse, J. dissenting.

Compensation signifies amends, recompense, or remuneration. And there must be some person to make or render, as well as another person to accept and receive. *Per* BROWN, J.

Just compensation for property wrongfully taken; or for property taken under the pressure of public necessity, means nothing less than the prompt restoration of every thing taken, or its equivalent rendered in something which the taker has a right to bestow. *Per* BROWN, J.

Where the lands of any given number of persons are taken, or assessed, to provide a municipal corporation with the means of dedicating, grading and paving a public avenue, for public use, unless the body corporate pays something out of the public treasury, or parts with some portion of the public property, as an equivalent, it can not be said to make compensation. *Per* BROWN, J.

Money, collected upon an assessment for grading a public avenue in a city, is *property*, within the meaning of the section of the constitution, which provides that " private property shall not be taken for public use, without just compensation." MORSE, J. dissenting.

THIS was a writ of certiorari, issued to the respondents, to bring up the proceedings taken by them for the grading of Flushing avenue in the city of Brooklyn, from Hampden-street to Clermont avenue; and also the proceedings for opening Flushing avenue from Nassau-street to the Wallabout road, and all maps and statements showing how said portion of Flushing avenue was laid out by the commissioners appointed by the legislature to lay out streets &c. in said city. The writ called for a return of all the proceedings and papers in said matters. The return set forth the presenting of a petition to the common council, by owners, on the 18th of May, 1846, asking for the grading and paving of the avenue; a report from the street committee, on the 8th of June, 1846, recommending the division of the avenue into two sections, and that the street commissioner advertise for proposals for grading each section, which report was adopted. Various other proceedings, resolutions and ordinances were also set forth, which occurred prior to the 26th of June, 1848. On that day the common council passed an ordinance designating Jacob B. Boerum and James C. Rhodes as assessors, to apportion and assess the expenses of the improvement as follows, viz.

" Be it ordained, by the common council of the city of Brooklyn, in common council convened, this 26th day of June, 1848,

The People v. The Mayor, &c. of Brooklyn.

that the assessors apportion the expense for grading Flushing avenue from Hampden-street to Clermont avenue, under such directions as shall be given by the street commissioner and one of the city surveyors.

And be it further ordained, that Jacob B. Boerum and James C. Rhodes be, and they are hereby designated to make an apportionment of the expense of said improvement, and to make a joint and equitable assessment thereof among the owners or occupants of all the land and premises benefited thereby in proportion to the amount of such benefit."

This ordinance was approved by the mayor, in due form, on the 27th of June, 1848, and a warrant was issued to the assessors, pursuant to the above ordinance, on the same day, by the mayor and clerk. The return of the assessors, with the assessment list, was also set forth, in which the expenses of the work were certified to amount to $22,190,61. On the 10th of July, 1848, a report was made by the assessment committee, and the common council passed a vote confirming the assessment, which proceedings were presented to and approved by the mayor. Various other proceedings were also set forth in the return to the certiorari, which it is unnecessary to mention.

*A. Crist*, for the relators. I. The whole proceeding is in violation of the constitution of the United States, and the constitution of the state of New-York, and therefore illegal and void. (*New-York Constitution, art.* 1, *sec.* 1, 6. *Amendments to Const. of U. S. art.* 5.) As to the meaning of the phrase "law of the land," see *Taylor* v. *Porter*, (4 *Hill*, 145.) The proceedings in this matter were taken under the 40th section of the city charter, (*Laws of* 1834, *p.* 80,) and under the 16th section of the street act, so called. (*Id. p.* 499.) (1.) The laying of the assessment, and the collection thereof, is the depriving a man of his property. (*Canal Bank, &c.* v. *The Mayor, &c.* 9 *Wend.* 251. *Jordan* v. *Hyatt*, 3 *Barb. S. C. Rep.* 275.) (2.) There are but three modes in which a person can legitimately be deprived of his property : 1. By due process of law ; 2. By the exercising of the taxing power ; 3. By taking it for the public use,

The People v. The Mayor, &c. of Brooklyn.

and for a just compensation. (3.) The laying an assessment and the collection thereof for a local improvement, is not the taking of property "by due process of law." (*Beekman* v. *Saratoga Railroad Co.* 3 *Paige,* 45, 73. *Jordan* v. *Hyatt,* 3 *Barb. S. C. Rep.* 275. *Taylor* v. *Porter,* 4 *Hill,* 147. *Matter of Albany-street,* 11 *Wend.* 149. *Matter of John and Cherry-street,* 19 *Id.* 659. *Varick* v. *Smith,* 5 *Paige,* 137. *Bloodgood* v. *Mohawk Railroad,* 18 *Wend.* 9.) (4.) The assessment in question does not fall within the legitimate scope of the taxing power. (*Vattel, b.* 1, *ch.* 20, § 244. *Burlamaque, part* 3, *ch.* 5, §§ 14, 24. *Sutton's Heirs* v. *City of Louisville,* 5 *Dana,* 28. 2 *Kent's Com.* 332. *Post* v. *City of Brooklyn, MS. Matter of Mayor of New- York,* 11 *John.* 77. *Bleecker* v. *Ballou,* 3 *Wend.* 263. *Sharp* v. *Spier,* 4 *Hill,* 76. *Livingston* v. *Mayor of New- York,* 8 *Wend.* 85. *Stryker* v. *Kelly,* 7 *Hill,* 9.) (5.) The assessment in question is not the taking of private property for a just compensation. (*Vattel, b.* 1, *ch.* 20, § 244. *Rogers* v. *Bradshaw,* 20 *John.* 105. 1 *Bl. Com.* 139. 2 *Kent's Com.* 339. *Jacob* v. *City of Louisville,* 9 *Dana,* 114. *Sutton's Heirs* v. *Louisville,* 5 *Id.* 28. *Beekman* v. *Mohawk Railroad,* 19 *Wend.* 35. *Post* v. *City of Brooklyn,* 6 *Barb.* 209.)

II. The proceeding is unconstitutional, because the assessment is not made, in the mode or by the persons, designated in the constitution. (*Art.* 1, § 7, *N. Y. Constitution.*)

III. The proceeding is unconstitutional, because no notice was given to the owners of the land assessed. They had no opportunity of being heard before the assessors. (*Jordan* v. *Hyatt,* 3 *Barb.* 275. *Owners &c.* v. *Mayor, &c.* 15 *Wend.* 375.)

IV. The assessment is irregular, illegal and void, for the following reasons, viz. (1.) The resolution to do the work (if any such was ever passed by the common council, was never approved by the mayor, or in any other way became a valid legal resolution. (*City Charter,* § 6. *Laws of* 1834, *p.* 90. *Kennedy* v. *Newman* 1 *Sandf. S. C. Rep.* 187. *Hodges* v. *City of Buffalo,* 2 *Denio,* 110. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 636. *Angell & Ames on Corp.* 5. *Williams* v. *Peyton, lessee,* 4

The People *v.* The Mayor, &c. of Brooklyn.

*Wheat.* 77.) (2.) No warrant was ever directed by the common council to be issued to the assessors, and no legal warrant was ever issued. (*City Charter,* § 40.) (3.) The amount which the property assessed is benefited by the improvement, has never been ascertained. It has never been ascertained or determined that the property assessed is benefited, or what property is benefited. This was necessary before the assessment could be made. (*Matter of Flatbush Avenue,* 1 *Barb.* 286.) (4.) The making of a new contract for the doing of the work, the first contract still remaining in force, was irregular. (5.) The following items of expense improperly assessed, viz. "Extra work 31,006 loads, at 6 cents, J. O'Donnell, $1860,36." (6.) The street in question was never regularly opened, and the common council had no power to cause the same to be graded.

*H. C. Murphy,* for the respondents. I. Assessments for grading and regulating a street are not contrary to the constitution of the United States, or the constitution of the state of New-York. They are local taxes for a limited public purpose, imposed by the sovereign power, whose authority to lay them is expressly recognized by the constitution, and has been too long admitted to be questioned at this late day. (1.) There is no clause prohibitory of them in the federal or state constitutions, though they existed at the time of the adoption of both of them. (3 *Black. Com.* 73. 6 *Com. Dig. Sewers E.* 2 *and* 5. *Laws of New-York, Greenl. ed. vol.* 1, 441. *Sess. Laws of* 1800, *p.* 16, 73. *Id.* 1807, *p.* 55. *Id.* 1836, *p.* 8. *Stat. at Large,* 25 *Hen.* 8, *ch.* 5. (2.) In common language, taxes and assessments are synonymous. In the language of our statutes the only difference is, that taxes are held to mean charges made for general public purposes, and assessments are charges for limited public purposes arising in localities. (*Livingston v. Mayor of New-York,* 8 *Wend.* 101, 2. *Owners &c. v. Mayor, &c. of Albany,* 15 *Id.* 376, 7. *Thomas v. Leland,* 24 *Id.* 60. *Stryker v. Kelly,* 7 *Hill,* 23, 4. *R. S. part* 1, *ch.* 16, *tit.* 1, § 2.) (3.) In saying that assessments are not taxes, our courts have expressly declared they meant only that assessments were not

taxes, within the intendment of the general tax law, exempting certain property from taxation, or of other statutes, arising from their peculiar phraseology. (*Matter of the Mayor, &c. of New-York,* 11 *John.* 80.) " It is no tax within the meaning of the exemption." (*Bleeker* v. *Ballou,* 3 *Wend.* 266. *Sharp* v. ·*Spier,* 4 *Hill,* 82.) Both rely upon the preceding case. (*See also,* 6 *John.* 92 ; 4 *Hill,* 103.) (4.) Assessments are not the taking of private property for public purposes, within the constitution. The object of the constitution was to protect the people in the exercise of the right of eminent domain by the government. Assessments are contributions in money, and are referable to the taxing power of the state. If assessments are private property, then are all taxes private property, and equally obnoxious to the clause of the constitution in question. (*Overseers of Amenia* v. *Stanford,* 6 *John.* 92.) (5.) If the authority to lay assessments be not the taxing power, still they are not the taking of private property, within the constitution ; for that instrument recognizes the power to lay assessments, in express terms. (*See New Const. art.* 8, §. 9.)

II. If the assessments be unconstitutional, then the party should be left to his remedy by action ; and the writ should be quashed ; (*Rutland* v. *County Comm'rs of Worcester,* 20 *Pick.* 74. *The People* v. *The Mayor of New-York,* 2 *Hill,* 13. *In the matter of Mount Morris Square,* 2 *Id.* 28, 9 ;) and that after return and argument on the merits. (15 *Wend.* 198. 1 *Hill,* 195, 100. 2 *Id.* 12, 29.)

III. Although a *statutory* certiorari, where the statute expressly gives the court authority to award a certiorari to review adjudications of inferior tribunals on the merits, the court may look beyond the question of power ; (*Anderson* v. *Prindle,* 23 *Wend.* 617. *Niblo* v. *Post,* 25 *Id.* 280 ;) yet under a *common law* certiorari, such as this, the court will not look into any evidence or other matter in the return, beyond the record, and into that only for the purpose of seeing whether the tribunal below had jurisdiction and had proceeded legally : and if the return contain any thing more it will be disregarded *pro tanto.* (*Rathbun* v. *Sawyer,* 15 *Wend.* 452. *Ex parte Mayor of Albany,*

23 *Id.* 287.  *Anderson* v. *Prindle, Id.* 617, 18.  *The People*
v. *The Mayor*, 2 *Hill*, 11.  *Matter of Mount Morris Square,*
*Id.* 27.  *See also the opinion of Chief Justice Nelson, in Niblo*
v. *Post*, 25 *Wend.* 284, *above cited, and the cases referred to*
*by him.*)

IV. The respondents had power to make the improvement,
upon their mere motion, without petition or other preliminary,
and without passing a resolution.  (*Act to incorporate the city*
*of Brooklyn, passed April* 8, 1834.  *Sess. L. of* 1834, *p.* 105,
§ 40.  *Act to amend the same, passed March* 28, 1836.  *Sess.*
*L. of* 1836, *p.* 101, § 1.  *Mount Morris Square*, 2 *Hill*, 20, 21.
*Brady* v. *The Mayor, &c. of New-York*, 1 *Barb. S. C. R.* 591.)

V. The subsequent proceedings were regular.

VI. Flushing avenue had been opened, and the proceedings
for that purpose confirmed by this court.  It was afterwards
ratified by the legislature, before the corporation of Brooklyn
took any action to grade and regulate the same.  (*See Laws of*
1846, *p.* 345.)  It was acquiesced in by all parties.  That pro-
ceeding can not be inquired into in this way.  Besides, it is not
admitted, nor does it appear, that it was opened on any other
lines than those laid down by the commissioners under the act
entitled " An act authorizing the appointment of commissioners
to lay out streets, avenues and squares, in the city of Brooklyn,"
passed April 23, 1835.  (*Elmendorf* v. *The Mayor of New-*
*York*, 25 *Wend.* 697.)

VII. The writ of certiorari in this case should be quashed, on
the ground of public inconvenience and prejudice to subsequent
purchasers, even if some of the points be well taken against the
proceedings.  Some of the premises assessed have since been
sold to the United States.  (*See Laws of U. S.* 1847-8, *p.* 268,
*Lit. & Brown's ed.*)  And the effect of setting aside the assess-
ment, would be to shift the charge from the vendors, upon either
the city at large, or upon the vendees.  (*Elmendorf* v. *The*
*Mayor of New-York*, 25 *Wend.* 695.  *The People.* v. *The*
*Mayor of New-York*, 2 *Hill*, 11.  *The People* v. *The Mayor,*
*&c.* 5 *Barb.* 43.)

BROWN, J.   The 40th section of the act to incorporate the city of Brooklyn, passed April 8, 1834, provides that assessments for grading, leveling, graveling and paving streets, avenues and squares, shall be submitted to the common council for confirmation, who are empowered to alter the same in such manner as in their opinion justice may require.   From the return in this case it appears that the assessment for grading Flushing avenue was submitted to the common council accordingly, and by them confirmed on the 10th day of July, 1848.   This act of confirmation is an exercise of judicial authority, and the proceedings are therefore subject to be removed into this court by the common law writ of certiorari, for review. (6 *Wend.* 564.  20 *John.* 430. 8 *Pick.* 218.   2 *Hill,* 14.   5 *Barb. S. Court Rep.* 43.

In examining the proceedings of the mayor and common council of Brooklyn, for grading Flushing avenue, as they appear in the return to the writ issued in this cause, we encounter at the threshold a grave question of constitutional law.   The power of the legislature to pass laws giving to others authority to take private property for public use, such as streets, avenues and highways, or to defray the expense of their regulation and improvement, and to award compensation in benefits or the enhanced value to be derived from such use, is drawn in question and stoutly denied.   The relators insist that such laws, and the proceedings had under them, are infractions of the sixth section of the first article of the constitution, which declares, that " private property shall not be taken for public use, without just compensation."   As early as the 16th of April, 1787, the like power was given by an act passed at that time, to the mayor and common council of the city of New-York ; and under authority of similar legislative acts, it has been exercised to a very considerable extent in the cities and villages of the state from that time to the present.   The constitution of 1777 contained no provision like that referred to in the constitutions of 1846 and 1821 ; and until the time of the adoption of the latter, the only limitation upon legislative power over private property, was the principles of natural justice, which in free governments have usually been found sufficiently strong to protect the rights of private property.

and personal liberty.   Whether the absence of express constitu-
tional restraints will account for the introduction and long con-
tinuance of this mode of converting private property to public
use, it may not be worth while now to determine; for it is obvi-
ous that if, upon examination, it shall be found to be in conflict
with the organic law, neither the antiquity of its origin nor the
sanction of custom and common usage, can save it from judicial
condemnation.

   The judgment of the court of errors, in the case of *Livingston*
v. *The Mayor, &c. of New-York*, (8 *Wend.* 85,) was rendered
after the provision for the security of private property was en-
grafted upon the constitution of 1821.   It affirmed—as far as
such a judgment could affirm—the validity of these laws.   And
upon the doctrine of *stare decisis* it may- be said, they must
continue to be regarded as binding and effectual for all time to
come.   " If a decision," writes a learned commentator, " is made
upon solemn argument and mature deliberation, the presumption
is in favor of its correctness ; and the community have a right
to regard it as a just declaration or exposition of the law, and to
regulate their actions and contracts by it."   And after saying
that there are more than a thousand cases in the English and
American books which have been doubted, overruled, or limited
in their application, he adds, " Even a series of decisions are not
always conclusive evidence of what is law, and the revision of a
decision very often resolves itself into a mere question of expe-
diency, depending upon the consideration of the importance of
certainty in the rule, and the extent of property to be affected
by a change."   The decision in *Livingston* v. *The Mayor of
New-York* was given in 1831, and the main point in controversy
was whether the lands taken for the street had not already been
dedicated to the public use.   Two opinions only were delivered,
which relate almost exclusively to this branch of the case.   The
objection to awarding compensation in benefits to be derived
from the improvement, was distinctly taken upon the argument.
But the opinion of Senator Sherman barely alludes to it, while
that of Chancellor Walworth, (entering into no argument and
quoting no authority,) assumes, at once, the whole ground of

The People *v.* The Mayor, &c. of Brooklyn.

controversy, and speaks of the right to make compensation in benefits as a well settled principle.    We look into these opinions in vain for the evidence of that solemn argument and mature deliberation, which upon the doctrine of *stare decisis*, should give to this case the weight of authority sufficient to foreclose the judgment of all other tribunals upon the same question.    If Mr. Justice Bronson is not clearly right when he says, in *Butler* v. *Van Wyck*, (1 *Hill*, 438,) "It is going quite too far to say that a single decision of any court is absolutely conclusive as a precedent," he certainly does prove, by reference to numerous cases, that the court for the correction of errors did not abide by its own decisions.    I shall therefore treat the question of the validity of the power given to the defendants, by the 40th section of the act to incorporate the city of Brooklyn, as one that is open and unsettled.

Seen in its real aspect, the case under consideration is this. There is in the city of Brooklyn a street known as Flushing avenue, which by an act of the legislature passed May 13th, 1846, is declared to be a public street.    The public interest and convenience, it seems, demanded that it should be graded and improved from Hamden-street to Clermont avenue, to fit it for the public use.    Proceedings were accordingly instituted by the common council, under the act of incorporation for that purpose.    The necessary notices were published, contracts were made, and the work was either completed or rapidly progressing, at the time the writ in this cause was issued.    Two of the city assessors, acting under authority given to them by the common council, ascertained the expenses of making the improvements, and made what is denominated a "just and equitable assessment thereof, upon and amongst the owners and occupants of all the lands benefited thereby, in proportion to the amount of such benefits, and the estimated expense thereof."    The written report or assessment bears date the 27th day of June, 1848, is signed by the assessors, has been filed in the proper office, and confirmed by the common council, and the proceedings to charge the lands are thus made perfect and complete.    The expenses are ascertained to be $20,330,25, and are apportioned—not upon

The People *v.* The Mayor, &c. of Brooklyn.

all the lands in the city of Brooklyn—but upon seventy-three lots of ground, upon, or immediately adjacent to the avenue, the property of seventeen different proprietors, and is to be collected from them in consideration of the benefits and advantages which such lands will derive from the improvement of the street. Such assessments are by the 40th section of the act, made a lien upon the lands, and by the 42d section may also be collected from the goods and chattels of the owners and occupants; and for want of sufficient goods and chattels, the lands assessed may be sold by the common council, for the payment and satisfaction thereof. Thus if the proceedings are regular, and the statutes under which they are taken are of binding force, the proprietors may be divested of their title, and their property applied to the public use. Brooklyn is a large and extensive city, with a population of some one hundred thousand inhabitants, and a corresponding amount of real and personal estate subject to taxation. It is conceded that the avenue is an open street or highway, dedicated to the public use, and that the money proposed to be taken by the proceedings is to be devoted solely to its improvement, for that purpose. I assume, for all the purposes of this inquiry, that the proceedings have been regular, and in conformity with the laws in regard to the city of Brooklyn, and I shall confine myself solely to examine whether under the constitution, this sum of $20,330,25 can be taken from the seventeen proprietors, in the manner and for the purposes proposed. The subject will necessarily involve the consideration of several distinct questions which I propose to look at in detail.

Is the money mentioned in the assessment to be regarded as property, within the meaning of the 6th section of the 1st article of the constitution? It is said that the word property, as there used, must have reference to lands, or something which savors of the realty, or articles of personal property, which enters into the construction of public works, and can not mean money collected upon an assessment. The term property has a known legal signification. The right of property is defined to be " that sole and despotic dominion, which one man claims and

exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." " The objects of dominion are things, as contradistinguished from persons. Things real are such as are permanent, fixed and immoveable, and which can not be carried out of their place, as lands and tenements ; things personal are goods, money, and all other moveables ; which may attend the owner's person whereever he thinks proper to go." (2 *Black. Com.* 2, 16.) The term property must therefore be taken to comprehend money, as well as every thing of which man may legally have the absolute and exclusive dominion. Put a limitation upon the word property, so as to exclude money, and the constitution must fall short of one of its principal ends. Money is a convertible medium, the highest kind of property, and the power to coerce its payment, and then to apply it to the construction and improvement of a public work, is as strong an example as can be given of private property taken for public use. " Private property is taken for public use when it is appropriated to the common use of the public at large. A stronger instance can not be given, than that of a lot of an individual in a city converted into a street ; the former owner has no longer any interest or control over the property, but it becomes the property of the public at large, and under the control of the public authorities." (*Opinion of Ch. Justice Savage*, 15 *Wendell*, 374.) The money, therefore, mentioned in the assessment for grading Flushing avenue, must be deemed property, within the meaning of the last clause of the 6th section of the 1st article of the constitution.

It was said upon the argument, that an assessment for grading and improving a street was not a proceeding to take private property for public use ; but a legitimate exercise of the taxing power. Taxes and assessments are, in common language, synonymous terms ; oftentimes used to express the same idea. Our statutes speak of the assessment and collection of taxes, the equalization of the assessments, and the correction of the assessment rolls. And these expressions are used in reference to the general system of taxation, which obtains throughout the state. Our present business is to deal with things, and not with mere

The People *v.* The Mayor, &c. of Brooklyn.

words; and it will be found upon examination, that there is little or no analogy between taxes, in the legal and political sense of the word, and assessments or charges imposed upon lands for benefits to result from public improvements. "Taxes in free governments are usually laid upon the property of citizens according to their income, or the value of their estates. Tax is a term of general import, including almost every species of imposition upon persons, or property, for supplying the public treasury, as tolls, tribute, subsidy, excise, impost or customs." It is also "a sum imposed on the persons and property of citizens, to defray the expenses of a corporation, society, parish or company; as a city tax, a county tax, a parish tax, or the like." Free government is the offspring of civilization, and its chief excellence consists in the just and equal distribution which it makes of its burdens and benefits, and the protection it throws around individual property and individual liberty. Conspicuous amongst the conflicts between the crown and the people, is that, in regard to the power of taxation. Protracted from the reign of King John to the time of the expulsion of the house of Stuart, it terminated in the permanent ascendancy of that maxim—immemorial in the fundamental law of England—that taxation must proceed from the people themselves. History unrolls her ample page to little purpose, if the oppressions of that age can be repeated in this; and taxation select as the subjects of its exactions, classes or individuals, in exclusion of the masses, upon the plea that they are profited by the public expenditures. Chief Justice Marshall, in *McCullough* v. *The State of Maryland*, (4 *Wheat*. 428,) speaks in this wise: "It is admitted that the power of taxing the people, and their property, is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security to be found against the abuse of this power, is the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. *This is*, in general, a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government

a right of taxing themselves and their property ; and as the exigencies of the government can not be limited, they prescribe no limit to the exercise of this right, resting confidently on the interest of the legislator, and the influence of the constituents over their representatives, to guard them against abuse." It will be seen, that the legitimate object of a tax is to supply the public treasury, or to meet some public exigency. It is imposed by the representative body, and falls upon the persons or the property of the constituents, equally ; and the security against its abuse, is found in the mutual interests and mutual relations of both. In these concomitants of taxation, street assessments are wanting. They are imposed, not to supply the public treasury, or to meet a public exigency, but to obtain remuneration for a real or pretended benefit. They are not imposed upon the persons of the inhabitants of a city, or town, or village, established by law for certain purposes as a local sovereignty, generally, nor upon their property equally, but upon the lands which, in the opinion of the assesssors, are enhanced in value ; and the only security against injustice and oppression, is taken away. The true rule, I apprehend, is thus laid down by Chief Justice Robertson, in *Sutton's heirs* v. *the City of Louisville,* (5 *Dana*, 28.) "A common burden should be sustained by common contributions ; regulated by some fixed general rule, and apportioned according to some uniform ratio of equality. Thus, if a capitation or personal tax be levied, it must be imposed on all the free citizens equally and alike. Or if an *ad valorem* or specific tax be laid on property, it must bear equally, according to the value or kind, on all the property, or on each article of the same kind owned by every citizen." The opinion of Mr. Justice Beardsley, in *Stryker* v. *Kelly,* (7 *Hill,* 9,) is an authority in favor of the doctrine that assessments for benefits fall within the legitimate exercise of the taxing power. His authorities, however, do not bear him out in that position ; and his reasons evade the real question. He quotes the case of *Livingston* v. *The Mayor of New-York,* (8 *Wendell,* 101,) to which I will refer hereafter, and *Beekman* v. *The Saratoga and Schenectady Railroad Co.,* (3 *Paige,* 45,) and says : "Upon the as-

sumption that the opening of the avenue would enhance the value of his property, a charge was imposed upon it to pay the expenses thus incurred.   This was local taxation for a local purpose, and falls within the legitimate exercise of the taxing power.   In towns, individuals are taxed, to make and repair the town highways, and in cities, to grade and pave streets.   Each town has its local tax for town expenses, as has also each county to meet county charges.   These are modifications of the taxing power, and quite as obnoxious to the constitutional objection raised, as is the assessment of lands benefited by the opening of a street to meet the charges for such an improvement."   If the learned justice had furnished us with a single instance of local or general taxation, where a tax is levied upon a few individuals in exclusion of all others, his argument would have been more to the purpose.   Towns and counties are severally charged with their own expenses, and in this respect stand upon terms of perfect equality.   But town, county and state taxes are assessed and collected in one proceeding under general laws, extending over the entire state, and are imposed upon all real and personal estate, the value of which is ascertained and equalized in the assessment rolls with just precision, so that all shall contribute in just proportion to the public exigencies.   For as Vattel wisely says, " the expenses of the state ought to be supported equally, or in just proportion.   It is in this as in the throwing of merchandise overboard, to save the vessel."   " The citizens," writes another commentator, " are entitled to require that the legislature itself shall cause all public taxation to be fair and equal, in just proportion to the value of the property, so that no one class of individuals, and no one species of property, may be unequally or unduly assessed."   That counties and towns are chargeable with their own local expenses, and for some purposes are separate collection districts, is for the convenience of the internal administration, and in no wise affects the primary law of taxation.   Even the highway tax is imposed by general laws, and aims at the most exact equality.   Every male inhabitant above the age of 21 years, is to be assessed at least one day, and the residue is to be apportioned upon the real and personal estate of the inhabitants, as

the same shall appear on the last assessment roll, and upon the lands of non-residents. The school tax follows the same rule. These modifications of the taxing power proceed upon the principles of justice and equality, which lie at the foundation of just government, whatever may be its form. They aim at a fair distribution of its burdens amongst those who enjoy its advantages. The instances of the exercise of the taxing power cited in *Stryker* v. *Kelly*, as authority for the rule there laid down, in my judgment fail to answer any such purpose. To seize upon the property of any given class of individuals, and convert it to the public use, in the opening or grading of a public street, or in the construction of any other work of public improvement, is an exertion of power which derives no support from the usage of the government in regard to other modes and subjects of taxation, and if it can be maintained in the face of the constitutional objection, it can not be as a legitimate exercise of the taxing power.

The statute of the 25th Edw. 1, provided that " No tallage or aid shall be taken or levied by us or our heirs in our realm without the good will and assent of archbishops, bishops, earls, barons, knights, burgesses, or other freemen of the land." Lord Coke has the following note upon this statute, in his 2d Institutes, 532. " Tallagium or tailagium, coming of the French word tailler, to share or cut out a part, and metaphorically is taken when the king or any other hath a share, or part of the value of a man's goods or chattels, or a share or part of the annual revenue of his lands, or puts any charge or burden upon another : so that tallagium is a general word and doth include all subsidies, taxes, tenths, fifteenths, impositions or other burthens or charges put or set upon any man, and so is expounded in our books : here it is restrained to tallages set or levied by the king or his heirs." The statute of the 34th Edward 1st also enacted, that " aids, tasks nor prizes should not be taken but by the common consent of the realm and for the common profit thereof." And the same writer says of this provision that it " gave great satisfaction to all, for hereby it enacted that every aid and task and other taking must have two special properties, the one in the creation, viz. that it be given by the common consent

of the whole realm in parliament—the other in the execution, viz. that it be given and employed for the common benefit of the whole realm, and not for private or other respects." In *The matter of the Mayor &c. of New-York*, (11 *John.* 77,) several churches—under the statute which exempts church property from taxation—claimed to have their lots exempt from assessments for opening and improving streets, and upon the question whether such assessments were to be regarded as taxes, the court say " The word taxes means burdens, charges or impositions, put or set upon persons or property, for public uses, and this is the definition which Lord Coke gives to the word talliage. (2 *Inst.* 532.) And Lord Holt, in *Carth.* 438, gives the same definition, in substance, of the word tax. To pay for the opening of a street in a ratio to the benefit or advantage derived from it, is no burden. It is no talliage or tax within the meaning of the exemption." In *Bleecker* v. *Ballou*, (3 *Wend.* 263,) the defendant had covenanted to pay all taxes, charges and impositions, and one point was whether an assessment for paving a street was a tax which the defendant was to pay under the covenant, and the court say, " There is no doubt that the assessment in question was not a tax, that being a sum imposed, as supposed, for some public object." *Sharpe* v. *Spier*, (4 *Hill*, 76,) was an action of ejectment for lands in Brooklyn. The defendant set up a title under an assessment sale, for making a well and pump in Willow-street, and the question was whether an authority given to sell lands for every description of taxes, was also an authority to sell for assessments for city and village improvements. Justice Bronson, in his opinion, uses this language : " Now the first remark upon this section is, that it only authorizes the sale of lands for the payment of a tax ; and although it extends to a tax of every description, still it includes nothing but a tax of some kind. Our laws have made a plain distinction between taxes, which are burdens or charges imposed upon persons or property to raise money for public purposes, and assessments for city and village improvements which are not regarded as burdens, but as an equivalent or compensation for the enhanced value which the property of the person assessed has derived from the improve-

ments." The case in the 11th Johnson's Reports was decided in January, 1814, and that of *Sharpe* v. *Spier* in January, 1843; and thus we see that for a period of nearly thirty years anterior to the case of *Stryker* v. *Kelly*, this court has repeatedly repudiated the idea that an assessment like that for grading Flushing avenue, could be regarded as a lawful exercise of the taxing power.

The sixth section of the first article of the constitution provides, that no person "shall be deprived of life, liberty, or property, without due process of law." And the inquiry now occurs, whether the proceedings to take away the $20,330,25, from the persons named in the assessment, are the "due process of law" referred to. Happily for us we are no longer left in doubt as to the legal import of the words "due process of law." The principle to which these words refer was first embodied in the great charter, which "has declared that no freeman shall be disseised or divested of his freeholds or of his liberties, or free customs, but by the judgment of his peers, or by the law of the land. And by a variety of ancient statutes, it is enacted that no man's lands or goods shall be seized into the king's hands against the great charter and the law of the land. And that no man shall be disinherited, nor put out of his franchises, or freehold, unless he be duly brought to answer, and be forejudged by course of law; and if any thing be done to the contrary it shall be redressed and holden for none." (1 *Black. Com.* 138.) In *Taylor* v. *Porter*, (4 *Hill*, 140,) Mr. Justice Bronson has given a judicial exposition of the words "due process of law," as they are used in the sixth section of the first article of the constitution, which few will venture to gainsay. It is this: "The words 'due process of law,' in this place, can not mean less than a prosecution or suit, instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt, or determining the title to property. It will be seen that the same measure of protection, against legislative encroachment is extended to life, liberty and property. And if the latter can be taken, without a forensic trial and judgment, there is no security for the others." He quotes 2 *Kent's Com.* 13, 2 *Just.* 45, 50,

10 *Yerger*, 49, and *Hope* v. *Henderson*, (4 *Dev.* 1,) in which latter case it is said that " the law of the land" in bills of rights does not mean merely an act of the legislature; for that construction would abrogate all restriction on legislative authority. The clause means that statutes which would deprive a citizen of the rights of person or property, without a regular trial, according to the course and usage of the common law, would not be the law of the land, in the sense of the constitution." In an assessment upon lands for the benefits or enhanced value to result from the opening, grading or paving a public street, or for any other work of public improvement, no suit is instituted or prosecuted, according to any of the known forms or solemnities, and there can be no forensic trial and judgment, and therefore it is a proceeding not within the intent and meaning of the words " due process of law." No effort is made to disguise the true character of the proceedings in this case. They make no pretensions to the dignity of " due process of law." Nor do they profess to regard the money, which it is their object to collect, as a tax. But the directions to the assessors are, " to apportion the estimated expense for grading Flushing avenue from Hampden-street to Clermont avenue, and make a just and equitable assessment thereof, upon and amongst the owners and occupants of all the lands and premises benefited thereby, in proportion to the amount of such benefit, as each shall be deemed to acquire by the said improvement:" It is a remarkable feature of such like assessments, that the measure of the enhanced value of the adjacent lands is the exact measure of the cost of the improvement, whatever that may happen to be. In the present case the enhanced value is set down at $20,330,25, because that is the cost of the improvement; and had its cost been ten times that sum, no doubt the tendency of the enhanced values would have been upward, until they reached a corresponding amount. The proceedings concede that there is a binding obligation to award compensation for the property taken, and therefore the ingenious and specious contrivance that the enhanced values shall advance *pari passu* with the expenditures. This brings us to consider the only remaining question, to wit, whether the

enhanced value of the lands assessed is just compensation, within the meaning of the latter clause of the sixth section of the first article of the constitution.

I have already noticed the case of *Livingston* v. *The Mayor of New-York*, where the chancellor held the affirmative of this proposition. He had occasion, he says, to examine it, in *Beekman* v. *The Saratoga and Schenectady Railroad Co.* and there came to the conclusion that the objection there taken to this mode of compensation was unsound. The latter case is reported in the 3d Paige, and indicates no opinion as to the sort of compensation demanded by the constitution. So that we are left without authority for *Livingston* v. *The Mayor of New-York*, except such as may be found in the reasoning of the chancellor. "The owner of property," he says, "is entitled to a full compensation for the damages he sustains thereby; but if the taking of his property for the public improvement is a benefit rather than an injury to him, he certainly has no equitable claim to damages." This may be true as an abstract proposition, but it evades the point in dispute. The question is not one of equitable offset, or of equitable cognizance of any kind. The right to a full and adequate compensation for property taken for public use, depends upon no equities which may possibly grow out of the purpose to which it may be applied, but upon strict right. The mandate of the constitution is not to adjust the equities, but to make just compensation. "Besides," proceeds the opinion, "it is a well settled principle that where any particular county, district, or neighborhood, is exclusively benefited by a public improvement, the inhabitants of the district may be taxed for the whole expense of the improvement, in proportion to the supposed benefit received by them." Where shall we find the record of this well settled principle? Where, or by whom, was it first engrafted upon the written or unwritten law of the land? Which of those magnificent and costly public works that adorn the state of New-York, and mark the genius and enterprise of her people, owe their construction to the application of this principle? In which of the numerous counties, or towns, or neighborhoods of the state has the expense of

The People *v.* The Mayor, &c. of Brooklyn.

erecting, or maintaining, public buildings, or other public improvements, been imposed upon property in the vicinity, and adjusted upon the rule of supposed benefits? The report of the case referred to, gives us no information. A rule of action may be said to be well settled, when it has the sanction of long established usage, or the recorded judgment of the tribunals of justice, and does not conflict with some other rule of equal or paramount authority; but unsupported by such evidence, its authenticity may well be doubted.

The measure of compensation in benefits or enhanced value, if it obtains at all, must apply as well to money assessed and collected to grade and make a public street fit for travel, as to the lands over which the street runs. Both the lands and the money are taken for the public use, and if compensation must be made for the one, so it should be for the other. It has been settled by a series of decisions, that the right of eminent domain may be exercised either directly by the agents of the government, or through the medium of corporate bodies, in all cases of public improvements from which a benefit would result to the public. Railroad, plankroad, canal and turnpike incorporations, acquire property against the will of the owners, under this modification of the right of eminent demain, upon making the just compensation provided by the constitution; when not made by the state, it shall be ascertained by a jury or commissioners appointed by a court of record; but in regard to the compensation itself, it is the same, whether the property is taken by the state for an arsenal or a dock, by a corporation for a railway, or a municipal body for a public avenue. If the compensation may be made in benefits, in the one class of cases, so it may be in the other; and those who maintain that a municipal corporation may take private property to make or grade a public avenue, and then make compensation in benefits, must also make up their minds to maintain that a railroad or plankroad incorporation may do the same. The prohibition against taking private property for public use without just compensation, is general and universal in its application. It recognizes no exceptions; and what is just compensation must be measured by the actual value

of that which is taken, at the time it is taken, and not by the uses to which it is to be devoted.

Six years after the decision in the case of *Livingston* v. *The Mayor, &c. of New-York,* the question again came up for review in the court of errors, in *Bloodgood* v. *The Mohawk & Hudson Railroad Co.* (18 *Wend.* 9.) It assumed another aspect, and elicited opinions which recognize and respect the rights of property, and are in harmony with the principles of justice and the true spirit of the constitution. One of the principal questions discussed and decided was, at what time the property could be appropriated to the public use ; whether before, or not until after, the compensation was ascertained and paid. It will be seen that this inquiry involves the very question in controversy in this cause, and brought the court directly to reconsider the judgment given in *Livingston* v. *The Mayor of New-York.* For if benefits, or enhanced values, entered into and formed the whole or any part of the compensation, the only time when that sort of compensation could be rendered was after the property was appropriated, and the time when the work of improvement was completed. The court, after a careful and elaborate examination of the whole subject, " declared and adjudged, that the legislature of the state has the constitutional power and right to authorize the taking of private property for the purpose of making railroads, or other public improvements of the like nature, paying to the owners of such property a full compensation therefor, whether such public improvement is made by the state itself, or through the medium of a corporation or joint stock company." Chancellor Walworth, in an opinion marked with more than his usual ability, says : " I hold that before the legislature can authorize the agents of the state, and others, to enter upon and occupy or destroy, or materially injure, the private property of an individual, except in cases of actual necessity, which will not admit of any delay, an adequate and certain remedy must be provided, whereby the owner of such property may compel the payment of his damages or compensation ; and that he is not bound to trust to the justice of the government to make provision for such compensation by future legislation." " It cer-

tainly was not the intention of the framers of the constitution to authorize the property of a citizen to be taken, and actually appropriated to the use of the public, and thus compel him to trust to the future justice of the legislature to provide him compensation therefor. The compensation must be either paid to him, before his property is thus appropriated, or an appropriate remedy must be provided upon an adequate fund, whereby he may obtain such compensation, through the medium of the courts of justice, if those whose duty it is to make such compensation refuse to do so." Senator Edwards, in the same case, speaks in this wise : " The power of taking private property for public purposes is at best an arbitrary power, and justified only by the law of necessity, and therefore should never be exercised without rendering promptly an equivalent to the individual sufferer." Here is not one word in regard to equities, or the adjustment of equitable claims ; nor is there any thing said touching compensation in benefits or enhanced values, which always depend upon future and uncertain contingencies ; but payment is insisted upon ; the equivalent is to be rendered promptly ; the individual whose property is taken under the rigor of public necessity is spoken of as a sufferer and not as a beneficiary—he is not to trust to the uncertain justice of future legislation—and the compensation is to be actually paid, or secured upon an adequate fund, before the entry can be made, or the property appropriated. This just exposition of the rights of private property can not stand side by side with the law of compensation by benefits.

In England, where the authority of parliament is said to be supreme, the right of private property, like that of personal liberty, is held to be sacred and inviolable. " So great, moreover, is the regard of the law for private property, that it will not authorize the least violation of it ; no, not even for the general good of the whole community. All that the legislature does, is to oblige the owner to alienate his possessions, for a reasonable price ; and even this is an exertion of power which the legislature indulges with caution, and which nothing but the legislature can perform." (1 Black. Com. 139.) The reasonable price here spoken of means an equivalent in money. (9 Dana, 114. 5 Id.

28. 7 *Id*. 81.) " The right to take private property for public purposes is one of the inherent attributes of sovereignty, and exists in every independent government.   Private interests must yield to public necessity.   But even this right of eminent domain can not be exercised without making just compensation to the owner of the property.   And thus what would otherwise be a burden upon a single individual has been made to fall equally upon every member of the state." (*Justice Bronson, in* 4 *Hill,* 143.)   These sentences, like many others from the same pen, are no less remarkable for their truth than for the simplicity and force with which it is expressed; yet the last of them is utterly pointless and untrue, if compensation can be made upon the rule of enhanced values.   The burden of a public improvement may be shifted, by proceedings like those for grading Flushing avenue, from one person to another, or from more than one person to any other number of persons, more or less; but it is not " made to fall equally upon every member of the state." Whatever shifts or changes are made—whoever may be paid, and whoever is made to pay, the moment the avenue or public improvement is completed, the absolute and exclusive title therein vests in the public—the work of converting private property to public use is consummated, and the public have made no compensation, and paid nothing for it.   The lands upon which it is constructed, and the money expended to fit it for the public use, are the fruits of individual contribution, after all.   Compensation signifies amends, recompense, or remuneration.   And there must be some person to make or render, as well as another person to accept and receive.   The restoration of the whole of a given quantity of property, wrongfully taken away, whether it be the property of one man or that of ten, may sometimes be taken as a compensation for the wrong done; but the restoration of a part certainly would never be so esteemed.   So long as the wrongdoer retains a part, so long the demands of justice would remain unsatisfied.   Just compensation for property wrongfully taken, or for property taken under the pressure of public necessity, means nothing less than the prompt restoration of every thing taken, or its equivalent rendered in something which the

taker has a right to bestow. Where the lands of any given number of persons are taken or assessed to provide a municipal corporation with the means of dedicating, grading and paving a public avenue, for public use, unless the body corporate pays something out of the public treasury, or parts with some portion of the public property, as an equivalent, by what process of reasoning can it be said to make compensation? That the owners of lands occupied for the avenue have been compensated out of the moneys realized from an assessment made upon other lands in the vicinity, shifts the burden from the persons or property of one class to those of another, but it does nothing more. The obligation of the public to award compensation according to the constitution remains the same. The persons originally entitled to be compensated may be lessened or enlarged in number, or other persons—by means of the assessment and the collections made under it—may be substituted in their place, but until the common fund, or the common property of the public, is applied to extinguish the debt due for the value of the property taken, the obligation to make compensation has undergone no change, but remains in all its original force. The demands of the constitution are not satisfied by coercing one class of proprietors, to compensate another class; or by taking the lands of some and the money of others—no matter how equitable may be the rule of apportionment—and appropriating both to the construction of works designed exclusively for the public use, and of which the public have the exclusive title. If the language of the constitution could possibly be construed into the recognition of any thing less than a compensation in money made by the public from the public treasure, there would still remain the difficult task of showing that the medium in which the proposed remuneration is to be made, rightfully belongs to those upon whom the obligation to make just compensation rests. Benefits and enhanced values are not always the concomitants of newly opened streets, or costly public avenues. Examples are not wanting to show that similar undertakings, skillfully designed and carefully constructed, have been followed by depreciation in prices and irreparable injuries. The public can assert no just claim to the one and not at the

same time incur the hazard of the other. I am of opinion that the assessment should be vacated and set aside.

BARCULO, J. Having heretofore, in the case of *The People, ex rel. Post,* v. *The Mayor, &c. of. Brooklyn,* (6 *Barb.* 209,) given my views at length on the subject of the constitutionality of laws authorizing assessments for benefits, and having, by time, reflection and examination, become confirmed and strengthened in the doctrine there advanced, I shall not on this occasion go over the ground again, but confine myself to a brief consideration of the principal point made by the defendants. It is presented to us in these words :

"Assessments for grading and regulating a street are not contrary to the constitution of the United States, or the constitution of the state of New-York. They are local taxes for a limited public purpose, imposed by the sovereign power, whose authority to lay them is expressly recognized by the constitution, and has been too long admitted to be questioned at this late day."

The first answer that suggests itself to this proposition is, that there is no such thing known to the law, as "local taxes for a limited public purpose," in the sense claimed by the learned counsel. We all understand what is ordinarily meant by the phrase *local taxation for a local public purpose.* It is applied to taxes assessed upon a county, for erecting public buildings, and defraying other county expenses, or upon a town, or city, or village, or school district, for the legal public purposes of such locality. But there is a fundamental principle which lies at the foundation of, and which must be strictly adhered to in all such cases of, local taxation. The tax must be *coextensive with the district,* or in other words, it must be laid *upon all the property in a district which has the character of, and is known to the law as a local sovereignty for certain purposes.* Thus there is no power which can assess upon a few individuals the expense of a new court house for the use of the *county.* The assessment must be laid upon the individuals or property of the *whole county.* Nor can a park be bought and laid out, in a village, and the expense thereof be levied and collected of the adjacent

owners, as is too frequently the case.    This is not local taxation ; it is *robbery*.    Now in the case at bar this principle is plainly and palpably violated.    The attempted assessment is not laid upon any local community.    It is all laid upon less than twenty estates in a large city ; and one of the relators is assessed over ten thousand dollars, or nearly half of the whole amount.

The second answer to the proposition of the defendants' counsel is, that the assessment in question is not *a tax*.    The very essence of a legal tax requires that it should be apportioned *equally*, i. e. according to *principles of just equality*, upon all the property in the district to be affected.    The *amount* of the sum is governed by the *wants* of the public, and has no reference to the amount of pecuniary benefit received by the taxpayer. In the language of Judge Cowen, (24 *Wend.* 69,) the argument of the counsel " confounds two distinct legislative powers ; a simple power of taxation, with the power of taking private property for public use.    The former acts upon *communities*, and may be exerted in favor of any object which the legislature shall deem for the public benefit.    A tax to build a lunatic asylum may be mentioned as one instance.    If the power to impose such a tax were to be rested on the ground of *individual pecuniary benefit* to each one who should be called on to contribute, it is quite obvious that it would not be maintained a moment."    But in the case before us the assessment is rested solely upon the ground of " individual pecuniary benefit."    The assessors, in their report, say they have " made a just and equitable assessment thereof upon and among the owners and occupants of all the lands and premises *benefited thereby, in proportion to the amount of such benefit ;*" and in the language of the learned judge, which I most heartily adopt, it can not be " maintained a moment."

I readily grant that the legislature can authorize the corporation of Brooklyn to make the improvement in question, and to levy and collect a tax to defray the expenses.    The power would rest upon the same basis as the authority to build the city hall in which we hold our courts, or any other of the public buildings of the city ; and the cost would be paid by the same means—a tax upon the city.    This is *local taxation* for a *local public pur-*

*pose.* But the legislature has no original power, nor can the corporation have any derivative power, to select certain individuals and compel them to pay the expenses of any public improvement, upon the pretense that they are *especially benefited.* To call such an extortion a *local tax,* is a gross perversion of language, and a doctrine which can not be "maintained a moment."

I have heard this question twice discussed by counsel of great ingenuity and ability; I have given it all the consideration of which I am capable, and I can freely say that I have never yet heard, seen, nor been able to discover, any thing approaching a sound argument to show that this mode of assessing for benefits could be brought within any legal principle of taxation.

Morse, J. *dissenting.* Speaking of the class of laws, to which that now under consideration is admitted to belong, my learned brethren concede that the case of *Livingston* v. *The Mayor, &c. of New-York,* (8 *Wend.* 85,) " affirmed, as far as such a judgment could affirm, the validity of these laws." It is admitted that if decided upon sufficient reasons, that case is conclusive upon this court. I must be permitted to hold that authority binding and conclusive upon this court, unless it can be made perfectly manifest that the principle upon which the decision was made, was false and contrary to law. It is said that in his opinion in that case, the chancellor assumed at once the whole ground of controversy, and spoke of the right to make compensation in the benefits, as a well established principle. If the chancellor assumed a well known and notorious fact, it can not weigh against the force of that fact, that he did not deem it worth his time or that of the court of which he was a member, to prove its existence. That it was so notorious will appear, I think, from the statement in the opinion of Mr. Justice Brown in the present case, that " as early as the 16th of April, 1787, the like power was given by an act passed at that time, to the mayor and common council of the city of New-York, and under the authority of similar legislative acts it has been exercised to a very considerable extent in the cities and villages of the state

The People v. The Mayor, &c. of Brooklyn.

from that time to the present." The constant and unvarying opinion of the legislature, and of the judiciary, for more than forty years, that the principle in question was sound, and its application legal, must have been known to every member of the court of errors. The application of the law was as familiar in the city of New-York, as the provisions, and their application, of the road act in the country. It was a principle which had been adopted and acted upon by the legislature for more than forty years. It had been constantly administered and enforced by the judiciary for the same length of time. This was notorious. The case came from the supreme court which had affirmed the proceedings, and the court of errors unanimously affirmed the judgment of the supreme court, upon the ground that these laws were consistent with the constitution. The question whether these laws are constitutional, was fundamental in that case—was deliberately considered after argument, and their constitutionality unani-·mously sustained. The chancellor certainly was justified in assuming as a fact that the principle was established both in the legislative and the judicial departments of the government. My object is not to vindicate the chancellor, but to show why this court should not overrule the solemn and unanimous decision of the highest tribunal in the state, deliberately pronounced after hearing argument from the ablest men then at the bar of our courts. It is said, however, that "where a law is found to be in conflict with the organic law, neither the antiquity of its origin, nor the sanction of custom and common usage can save it from the judgment of judicial condemnation;" and the question must be decided by this court—whether the law under consideration is in conflict with the provisions of the constitution of the state?

The principle now supposed to be in conflict with the constitution was adopted into the legislation of the state as early as 1787, and from that time was continued down to 1821, when the second constitution was formed and adopted. For the present, it is not material to inquire whether the system of legislation in question was adopted as a regulation of the internal police of the state, and a mode of taxation incident thereto, or what it was. It was an institution in existence in 1821, and

had been for more than thirty years.   It was a complete system of statute law familiarly known to the legislature, the profession and to the courts.   It was as fixed and notorious a fact upon the face of the statute book, and in the body of the law of the state, at the time of framing and adopting the constitution of 1821, as was the institution for the maintenance of the poor, with its incidents.   It was a part of the body of the law of the state. These laws have been continued to the present day—more than sixty years.   They were constantly acted upon up to the time of adopting the constitution of 1821, and without a suspicion at that time of their invalidity, and they have been acted upon ever since.   Millions of dollars have been paid and invested upon the faith of these laws, even in the city of Brooklyn, to say nothing of the city of New-York, and other municipalities.   In 1821 a law was passed by the people in their highest sovereign capacity —by them personally—which became the supreme law of the state.   This law was in no respect different from a law of the ordinary legislature, except that it could not be repealed by that body, and any enactment thereof repugnant to it would be void. It was the constitution—the fundamental law of the state, but it was in the same language as all other laws—to be read, interpreted, and construed like all other laws.   If a doubt be suggested of the meaning of any passage in the constitution, we must apply to it the same rules of interpretation or construction as we apply to the interpretation of any other statute ; no one doubts this.   In 1821, the supreme legislature of the state—the people in their sovereign capacity—without the machinery of representation, enacted " that private property should not be taken for public use without just compensation."   Did this repeal the laws in question ? If my learned brethren are right in their interpretation, all of this class of laws then in existence were by the adopting of that constitution, *ipso facto* repealed.   If they were so repealed, it is because the framers of this clause, and the people who passed it, intended their repeal.   Is there any evidence of any such intention ? Let us examine the words, and see whether in their obvious and plain sense they import any such intention.   *Property* in its true meaning, and in its general

legal import, includes lands, tenements, hereditaments, and commodities—*that*, the value of which may be measured by money. It can not mean *money*, in this provision of the constitution, without involving the doctrine that money can not be taken of the citizen by way of ordinary taxation, without just compensation. And as it is insisted that the constitutional compensation is compensation in money, the absurdity would follow that in every case of a tax of ten dollars or any other sum taken from an individual, the government must return him the like amount in cash. We always in common conversation speak of property and of money—the one as that which constitutes wealth, the other as the measure of value and the representative of wealth. If a commanding general were to take possession of land for entrenchments, or of horses and wagons to transport his troops, or of meat and corn to feed them, from private persons, this would be taking property—private property, for public use. If he were to take money from an individual, to procure provisions and the like, this would be called a forced loan, or a benevolence or gift, according to the form which he might choose to give the transaction. I think there is no ground for saying that the words import the taking of money, within the intention of the framers of the clause of the constitution under consideration. It is apparent from the learned opinions of the majority of the court, that they feel the force of the argument to be so strong from the mere reading of the words, as to require a refined interpretation, by which is given to the word property the very broadest signification in which it is ever used when applied to anything exterior to the person. Because money in common with lands and commodities, is proper to its owner, it is said to be property. That a man has the same dominion and power over his money as over his lands and commodities, can not be doubted. But if the word property has a signification which includes lands and commodities, and excludes money, as well as a signification which includes money with lands and commodities, then we have to answer in which of these two senses is the word used in the constitution. I have already shown from the case of taking money by way of taxation, that it could not apply to, or be intended to include, the taking of money.

If it does, we must say in relation to all laws levying taxes, that being found in conflict with the organic law, neither the antiquity of their origin—and they are very ancient—nor the sanction of custom and common usage, can save them from the judgment of judicial condemnation.   That no such severe alternative is really presented, I think will appear evident from what I have already said, as well as from the consideration that these laws, at the adoption of the constitution of 1821, were in full force, and acted on as valid laws, as they had then been for upwards of thirty years.   They continued upon the statute book, and to be acted upon immediately after, the same as before the adoption of that constitution, and no one of the learned and able men who framed that instrument, or of the people who adopted it, understood that these laws were repealed by it.   Spencer and Kent, who down to that period had administered these laws, and Nelson and Sutherland, who from that period continued to administer them, were members of the convention that framed the constitution of 1821. As far as I can perceive, the discovery of the intention of the framers of the constitution of 1821, as now expounded, was wholly unknown to every member of the convention that framed that instrument, when they submitted their work to the people— to the people who then adopted it—to the courts which acted under it, and even to the profession of the law, until the question was raised by counsel celebrated for great ingenuity, in the case of *Livingston* v. *The Mayor, &c. of New-York,* in 1831.   It was then fairly and fully raised, and as was believed, as fairly and fully decided by the unanimous opinion of the court of errors, affirming the unanimous opinion of the supreme court, and in conformity to the opinion of the chancellor of the state.   This grave constitutional question then had, at least, comparative rest, until the wisdom of the people called together another council of the state, again to consider what improvements could be made in their organic constitutional law.   In 1846 a convention consisting of men of the highest intelligence and most approved virtue, assembled and formed a new constitution.   There were some who had been judges, and many lawyers, in that body, no less distinguished by their probity than their learning and general

The People *v.* The Mayor, &c. of Brooklyn.

intelligence.   A proposition was distinctly made in that convention, " that no assessment for any improvement in any city or village, shall be laid, otherwise than by general tax upon the taxable property of such city or village, levied and collected with an annual tax for other expenses." (*See Debates in Convention, Atlas ed. p.* 463, § 2 *of the proposed article ; also Nos.* 66 *and* 67 *of Doc. of the Convention and Journal, pp.* 581 *and* 1461.) This proposition was aimed directly at the system of laws now brought in question.   The mover declared that he presented that, with his other propositions, because the article submitted by the majority of the committees of which he was a member, and in the minority, " did not go to the root of the evils growing out of the defects of our present system of municipal corporations."   The article submitted by the majority, adopted by implication the system of local assessments, and regulated it.   No one seems to have thought the system unconstitutional ; but one member thought it inexpedient, and sought to repeal it, and to prohibit any future legislation upon the old principle.   He termed these laws collectively " the present system," thus not only recognizing their binding obligation, but truly declaring them a system—an institution of the state.   Notwithstanding the matter was thus brought distinctly before that body as a valid—though in the opinion of some members an unwise—system of law, still the convention refused to interfere with it.   Those learned, able and experienced men, who were then assembled, were aware of the existence and antiquity of this system of legislation—of its being sanctioned in every possible form by all the courts of the state, including that of last resort, and yet when the question was distinctly put to them, whether it was, on the whole, such a system as ought to remain, solemnly refused to abrogate it.   Clearly not because they deemed it void, but because they deemed it unjust or inexpedient to interfere with an institution so long in existence, and under which so many millions of property had been regulated.   But though they refused to destroy the system, they deemed it one requiring revision, and therefore upon the motion of the same member, adopted the *ninth section of the eighth article of the constitution* as it now

stands, imposing the duty upon the legislature to restrict the power of assessment by cities and villages, in order to prevent the abuses which had grown up, in assessments. The adoption of this clause not only repels most conclusively the idea of an intention to include within the term "private property" the assessments for municipal improvements, or of an intention to repeal the system, but distinctly recognizes both the power of the legislature over the whole subject, and the existence of the system as a valid one.

In relation to the clause of the constitution under consideration, and particularly as to the word "property," it is also to be observed that it is an universal canon of interpretation that words are to be understood in the sense in which they are used by the writer or speaker, even though that sense be new. If, therefore, the word property had no previous signification which made it only applicable to lands and commodities, still it would be perfectly evident from the reflections above submitted, that in the clause of the constitution under consideration it had that restricted meaning.

It is quite sufficient for sustaining the conclusion to which I have come, to show that the framers of the constitution of 1821, had no intention of repealing the laws then in existence authorizing these local assessments. But if shown, as I think it already is, that the framers of the constitution of 1821, as well as that of 1846, had these laws present to their minds, and actually intended not to repeal them, or prevent the passage of like laws in future, as exigencies should require them, more emphatically the proceedings below ought not to be set aside. It is due, however, to the magnitude of the question, that I should state my views of it independently of the controlling consideration, that the principle is as fixed as the constitution itself; and give the reasons of my opinion that these assessment laws, so called, are otherwise within the scope of legislative power.

Certain general principles must be borne in mind in this connection. All highways are the highways of the people of the state, in their sovereign capacity. They are among the first necessities, and are the indispensable conditions of civilization.

The People *v.* The Mayor, &c. of Brooklyn.

Bridges were ranked as one of the three necessaries of society by our Saxon ancestors, when laying the rude foundations of our present civilization. They were sufficient for their simple purposes. Having the bridge to cross the stream, they could perform journeys upon very indifferent roads. Bridges were, as we should from the reason of the thing expect, the first productions of art and heavy labor, as applied to the construction of the highways of civilized life. Highways, whether urban or rural, have been developed as civilization has advanced.

Taxation is a necessary inherent power in every government. The aids of the citizens must be levied in some way to carry out the objects, and attain the ends, of government. Every species of *aid* to the government for any of the purposes which it has a right to accomplish, is generally classed under the taxing power. A strange confusion of ideas seems to have obtained on this subject, even where great clearness of apprehension is usually met with, arising from a forgetfulness that all words of any value, in a living language, are constantly used in different senses, and require always to be understood in the sense in which they are used in the particular instance under consideration. Now the term " taxing power of the government," means that power of the government which enables it to compel the citizen to aid in accomplishing its proper ends by some fixed rule which is a law of the land. The exaction of labor upon the highways is just as much an exercise of this taxing power as the levying of money for the support of the poor. The power of taxation is therefore the power to compel by fixed and certain rules or laws, the citizen and the property within the jurisdiction of the state, to aid the government in its appropriate purposes, and in securing its lawful ends; one of which is to secure the establishment and repair of highways.

For purposes of distinction, the legislature of this state have used the word *taxes* to denote the exercise of the general power of taxation in the collection of money for general purposes, and in the compelling of aids by enforcing labor upon highways, and they have denoted the exercise of the same power—precisely the same in all its essential qualities and characteristics—when

applied to improvements of a public nature in cities, by the term *assessment.* Hence the courts have said *In the matter, &c. of New-York,* (11 *John.* 77,) that when the legislature exempted church property from taxation they had in mind this subordinate division of public aids—coming under the general power of taxation—into taxes and assessments—and did not intend to exempt that species of property subject to local improvements, from that peculiar mode of taxation. So in the case of *Sharp* v. *Speir,* (4 *Hill,* 76.) All that the court determined in those cases was, that the local assessment was not a tax within the meaning of that word as used by the legislature in the acts under consideration. It certainly answers all practical purposes, in denoting the power in question, to call it the power of taxation, though it would be a more accurate classification to say that it was the power of the organized government to compel the contribution by fixed and prescribed rules, of all necessary aids to enable the government to attain its just ends. This definition of course treats the government as made up of all its organs and ministers, forming that public authority to be aided.

The state of New-York has from its earliest known history, been divided into small districts for the purpose of the aids to the government in maintaining the public highways. This has always been the system in England. It is peculiarly Anglo Saxon. That this is a matter of public concern to the whole state is evident, first, from the fact that the system is organized and enforced by general laws; second, from the practice of the legislature, when, from any cause, the local administrations do not supply the public wants, it steps in and orders the thing done at the expense of the same localities which ought to have done it. An instance of this kind is found in the laws of 1845, chapter 193. Now there is no reason for saying that taxing a town for the establishment of a new road, or a small district for the repair of roads, is not taking private property for public use, but is taxation, and yet that to tax a district in a city for the like purpose, is not taxation, but taking private property for public use. Where can we stop, if we do not regard the

boundaries of road and street districts as ascertained under the laws of the state? If it be unconstitutional to make districts in a city to tax for the grading of its streets, by what authority can a road district in the country be compelled to do the same thing? This whole system of districts for all purposes, proceeds upon the ground of local benefits and advantages. It is in general adapted with a commendable accuracy as regards the principles of natural justice and sound public policy. It upon the whole works out an equal and just distribution of public burdens in proportion to the benefits conferred by the public on those who bear these burdens.

It is just that the state should pay for an arsenal for the state—for its capitol—and for all those objects of expense which concern—to an approximate equality—the whole state. The inhabitants of each small district in the state are compelled to keep in repair the highways in their districts; and this from the obvious convenience and ultimate exact justice of the thing. The inhabitants on, or very near a particular highway, have an immediate interest in its preservation and repair. It is easy and convenient for them to work it and to preserve it. Those at a greater distance have the same interest in the highways of their own neighborhood, and the same facilities for their preservation and repair. The inhabitants of any particular district, generally speaking, are more competent to judge of the necessity of new or additional highways, than others could be, while the inhabitants of distant districts have no immediate interest in the roads of each other. From these and like causes it has always been held expedient and right that highways in all their forms should be established and maintained at the expense of small districts within which they are located, or through which they pass. The interest and convenience of highways to a neighborhood, have been considered sufficient reasons for compelling these neighborhoods to maintain them; because, in the language of the statutes as applied to highways in the city of Brooklyn—if the particular district be benefited by the improvement, that is, the highway, the district so benefited shall pay for it. This is the true reason—the only conceivable reason

which can justify these local taxes. The principle adopted is—parties shall pay according to the benefit they derive from the highway; and this system being uniformly acted on, it comes out in the end that the state, in its sovereign and corporate capacity, has highways in every part of its inhabited territory, and that every part of that territory has borne its just part of the expenses—each district having been burdened, assessed or taxed according to the benefit it derived from the improvement for the highways within its limits. It may happen that in one district of the state it will be only at great expense and labor that a highway can be constructed or kept in repair. Yet because the people there inhabiting are benefited by it, they must bear the burden according to the benefit they receive. The inhabitants of the most rugged part of Putnam county, where great labor and expense is required to make and repair their roads, being specially benefited by these roads must bear the burden of making them. They can not call for aid upon the inhabitants of those parts of Long Island, where it is scarcely necessary to do more than to travel over a strip of land to make it a good road.

The people of the city of New-York, and the legislature in 1787, supposed that this principle might be justly applied to that city, and that the districts in which particular streets were to be opened and regulated for public use, being undoubtedly benefited in as great a degree, and in the same way as the country road districts were benefited, should bear the burden in the same manner. It is difficult to find any fault in their reasoning. By opening a street through a farm, that land which before was only valuable for farming or horticultural purposes, would become valuable for building lots, city residences, and places of business. The particular district fronting on this street would be immediately benefited; the benefit to any other location of the city would be very small—no more than it would be to the owner of a farm in Queens county to have a road opened and worked in Putnam.

This was the view of the matter which doubtless led to the laws under consideration. It was clear enough that these dis-

The People *v.* The Mayor, &c. of Brooklyn.

tricts along the respective streets would in most cases, and in a very short, time contain as many inhabitants as would be found in some of the smaller or more sparsely inhabited towns in other counties ; and there was therefore no objection to charge these districts with the expenses of these highways ; the laying them out and fitting them for use benefited those—and, in any appreciable degree—those only, who owned land to be affected by the improvement. When the streets were once laid out and opened and regulated for use, it was deemed more convenient to leave their repair to the whole city, so that the permanent organization of highway districts was not necessary. Thus, the occasion only requiring the district for taxation to be ascertained for the temporary purpose of levying and collecting a single tax, it was well enough to have the district fixed by men legally designated for the purpose, upon the only principle of the benefit to be derived from the improvement—the outer limit of appreciable benefit to be the limit of the district ; and as it was necessary that the benefit to be derived by those whose property was affected by the improvement, should be considered in order to form the district, it was proper to let the same body of men who determined the district also lay the tax—that is, make the assessment. There seems in all this nothing but taxation, and taxation upon a very old and familiar principle, clothed, to be sure, with some new words and phraseology in its name, and attended with some new circumstances, neither of which, however, affecting the principle in any degree whatever. There appears nothing unfair in this mode of taxation, but on the contrary one can hardly conceive a more just and righteous idea than that the burdens of supporting the government should always be borne according to the benefit received from the operation of the government. He who has a large amount of property to be protected, certainly derives a greater benefit from the protection of the government than he who has but a small amount, and is made to pay more for such protection. This is the theory of all just taxation— imperfectly realized, perhaps, as all human theories are—yet the one intended to be carried out, and acted on, by all good men in the community. To attempt to realize perfectly in practice this

The People *v.* The Mayor, &c. of Brooklyn.

idea of justice may be often impracticable, but can be hardly considered as outside the pale of legislative power. The legislature may attempt to bring taxation to a standard of justice—even though it be a refined justice, and the mode of doing so is legitimately within their determination. It was thought that by the ordinary mode of taxation upon the owners of property within these street districts, of a uniform per centage upon the value of the property within the district, great hardships would frequently be inflicted upon individuals ;—that in many cases it would happen from the peculiar circumstances of the location of lands,—the lines between adjoining owners—and various other causes, that one man would be more benefited than another, although the taxable value of their land might be the same. If the value of the land before, and without the street, were considered, it would often happen that within the district there would be two parcels of land of nearly, or exactly, equal value, owned by different persons, and that one of the parcels would be benefited many hundred per cent by the new highway, while the other would not be benefited at all, or very little. To approximate justice, the tax for opening the street must be laid as if the street were opened. But still, if it were a tax of a rate per cent upon the value of the property within the district benefited, it would not work out any thing like exact justice, because it would happen that some of the property within the district benefited would be so situated, having fronts on another highway already open, as to be much less benefited in proportion to its value, than other property which had no such front, except on the new street. As it was already established throughout the state that these improvements should be made and maintained by those who were deemed to be benefited by them—being those in the immediate neighborhood of them—it was expedient to carry out this principle one step further and ascertain how, and in what proportion each individual whose property was affected by the improvement, would be benefited, and to lay the burden or tax upon him in that proportion.

For ordinary purposes, in the country, it had always been deemed a sufficient approach to this exact justice to lay the bur-

den in the more ordinary form of taxation by a per centage upon the taxable property in the district which by law had to bear the burden. This, no doubt, was as near an approach to exact justice as could well be reached there by the necessary forms of law. In most cases, in cities, there would be no personal property in the district which could be called upon to defray the expenses of opening and regulating new streets. The land upon the street is what would receive the enhancement of value by the improvement; it was therefore just and equitable that the land should be charged—that is, taxed—with the expenses of the improvement. This principle, therefore, adopted by the legislature at a very early period, I mean the principle of local assessments, can not be distinguished in a single essential property from local taxes. The phraseology employed seems to me only intended to mark the circumstances which were peculiar to the subject matter of these laws, and to give a name to a taxation, not differing in kind, but in its forms of application from that generally applied throughout the state.

The term *local* taxation, moreover, is merely one of convenience, to designate taxation upon a region less than the whole state. It is one of the modes in which the taxing power of the state is exercised. The forms of using that power must necessarily rest in legislative discretion, and can not be interfered with unless they violate some constitutional right, or principle of justice. Mr. Justice Barculo, however, lays down a rule, as applicable to this power when exerted upon any locality less than the state, that "the tax must be co-extensive with the district, or in other words it must be laid on all the property in a district which has the character of, and is known to the law as a local sovereignty for certain purposes." That the tax must be co-extensive with the district, may be true. But that in order to constitute a lawful or constitutional tax, *all* the property in the district must be taxed, will be sufficiently shown to be an error, by the consideration, that no one has ever doubted the unqualified right of the government to impose a tax for any legitimate purpose on land only, when it is called a land tax, or to exempt the property belonging to various public bodies, institutions of

The People *v.* The Mayor, &c. of Brooklyn.

learning, churches, and clergymen, within the district of taxation. Nor is it apparent how the *liability* to taxation, requires the possession of any sovereign power. It is usual to take certain civil divisions of the state for the purposes of a more convenient administration of the taxing power. Every possible exercise of that power grounds its authority in the eminent domain of the people of the state, in their corporate and sovereign capacity. That high dominion is exercised by the supreme and central legislature. Its administration may be committed to such subordinate bodies as the legislature may deem proper, and be administered upon such principles of justice as it may prescribe. If the legislature require a court house to be built in a certain county, for the courts of the county, it is strictly for a county purpose— it is for the benefit of the county. The district taxed is practically the district benefited, and it is convenient to lay the tax in this way. But the fact that the same district has the delegated sovereign power to tax itself for the support of the poor, does not establish, or affect the *liability* of the inhabitants to be taxed for a court house. Neither are all local taxes for local purposes. The general terms of this court for this district, are held only in Brooklyn and Poughkeepsie, and the counties of Kings and Dutchess are taxed for the expenses of rooms, light, stationery, fuel and attendance. These are not local to those two counties. They are for the benefit of the nine counties of the second judicial district, and to a considerable extent of two counties of the third. Yet these burdens are imposed by the legislature of the state upon localities, while they are for general purposes.

I have thus far considered the system of districts for the purpose of single taxation and of taxation according to benefit, as if they were peculiar to city organization; but such is not the case. In fact, the grounds upon which assessments for urban improvements, under our laws, are denied to be local taxation, present themselves with equal force against our system for maintaining rural highways, and, if admitted, must overthrow our whole road system as unconstitutional.

The commissioners of highways annually divide their respective towns into so many *road districts* as they judge convenient,

and assign to each of the districts, such of the inhabitants liable to work on highways, as they think proper, having *regard to proximity* of residence, as much as may be, and the overseers, as often as they deem necessary, warn all persons assessed to work on the highways, to come and work thereon with the proper force and implements. (1 *R. S.* 502, § 1, *sub.* 5, 6, 7.) The towns, not the road districts, elect the overseers of highways for the districts. (1 *R. S.* 340, § 3.) Here we have an example of small districts, and they may be as small as the commissioners of highways choose to make them, annually determined on, and established *for a year only*, for the sole purpose of compelling the inhabitants to contribute their aid to the maintenance of the highways of the state. It is difficult to see how any one of these districts, as such, " has the character of," or is " known to the law as a local sovereignty for certain purposes." They exercise no act, in the nature of a corporate or sovereign act. It will hardly be thought that the passive capacity of the inhabitants, or part of the inhabitants of one of these annually established road districts to be compelled to work on the highway, will erect the district into a local sovereignty. It has been pressed as a consideration of great weight, that in the case before us one person is charged with half, or nearly half, the entire expense of the whole improvement, and that the amount is very large. It might not be deemed a very great hardship upon a farmer who happened to own half the land and other estate in a road district, as the relator in this case does within the assessed district, to be compelled to do half the work upon the roads in his district. It would be just, and most of those who escaped with far less exactions of labor, because of their small estates, would probably not object to these burdens if they could have the estates which caused them. Another striking analogy between the institution of road districts in the country, for the maintenance of highways, and the districts erected temporarily in cities for the making of streets, is that the commissioners in the one case in assigning to each of the districts in their town such of the inhabitants liable to work on the highways as they think proper, are to have "*regard to proximity of residence* as much as may be ;" thus

is clearly recognized the fundamental notion of benefit, as entering into the principle upon which the aid is exacted, and as a reason for the establishment of these small districts for the purposes of this peculiar taxation. But the provisions in relation to the taxation of the lands of *non-residents*, for these purposes, present the analogy still more forcibly. " Persons owning or occupying lands in the town where he or she resides," and the male resident inhabitants of the town over twenty-one years of age, are to be " assessed to work on the public highways." (1 *R. S.* 506, § 19.) And the lands of non-residents of the town are to be " assessed no more than one quarter of a day's labor, upon every hundred dollars of such valuation." (*Id.* 506, § 24, *sub.* 4.) Then follows this provision in subdivision 5 : " but no such non-resident tracts shall be assessed, unless the same will, in the judgment of the commissioners, be *enhanced in value by the highway labor* so assessed." Here is an explicit adoption of the assessment principle. The commissioners are not to proportion the burden according to the value of the property, until they have ascertained that the owner will be benefited by an enhanced value of his land by the labor to be contributed. The legislature take it as an established fact, that the inhabitants of a road district are benefited by the maintenance and reparation of the roads there, and, because they are so benefited, compel them to work on such roads. They take as an established fact, that the resident owners or occupiers of land, are more benefited than those who have no land, and make them contribute work in respect of such land over and above what they are to contribute in respect to their persons. That a non-resident who owns land in the district will be benefited, is not taken to be an established fact, but a matter of doubt; and so the question is submitted to the commissioners to determine whether his land will be enhanced in value by his labor upon the highways. If it will, then he is to be assesssed for this benefit—this enhanced value.

In a case like that before us, we are not at liberty entirely to disregard consequences. This is a question of property, not of life, liberty, or reputation. Whether correctly, or incorrectly

The People *v.* The Mayor, &c. of Brooklyn.

adopted, these assessment laws have become a rule of property for all the cities of this state. It was said that in Brooklyn alone, a quarter of a million of dollars are due to contractors, and to be collected upon assessments, for improvements contracted for upon the faith of the assessment laws; take all the cities and villages of the state together, and the amount is probably millions. If these laws be declared unconstitutional, who will lose this amount? By the decision of this court, the corporations are not liable, inasmuch as they are merely the agents or instruments to put these laws in motion; they being trustees for that purpose, the citizens at large have no interest in the improvements for which the assessments were laid, having respectively paid for their own, and therefore, on principles of justice, can not be called upon to contribute towards the expenses of others. The loss must probably fall upon the contractors, those who, upon the faith of the laws, and of an uniform practice under them by all departments of the government, have embarked their means in these works; while the gain will be to the owners of the property benefited by the improvements—*who would lose nothing if they pay it*, because their property has not been required to contribute for improvements on other streets. Whether the assessment system be a wise one or not, is for the legislature to determine; but if they determine against it, the operation will not be retroactive.

I am, for the reasons which I have now stated, compelled to the opinion that the provision of the constitution, not against taking private property for public use, *but for providing compensation to be made when it shall be taken*, does not apply to the laws in question, and that the proceedings of the common council should not be disturbed.(*a*)

Assessment vacated, and proceedings set aside.

(*a*) The Reporter is requested by Judge Morse to state that, although, in the case of *The People, ex rel. Post*, v. *The Mayor, &c. of Brooklyn*, (6 *Barb*. 209,) Judges Morse and McCoun concurred in reversing for irregularity, they did not assent to the opinion delivered by Justice Barculo.